RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0109P (6th Cir.)
File Name: 01a0109p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KENNETH R. SMOOT,
        _Plaintiff-Appellant,_

        _v._

UNITED TRANSPORTATION
UNION; CSX
TRANSPORTATION, INC.,
        _Defendants-Appellees._

No. 98-4322

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 94-00485—Peter C. Economus, District Judge.

Argued: December 1, 2000

Decided and Filed: April 11, 2001

Before: NORRIS and CLAY, Circuit Judges; ROSEN,
District Judge.[*]

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** Stephen R. Felson, FELSON & FELSON, Cincinnati, Ohio, for Appellant. John A. Edmond, GUERRIERI, EDMOND & CLAYMAN, Washington, D.C., John B. Lewis, ARTER & HADDEN, Cleveland, Ohio, for Appellees. **ON BRIEF:** Stephen R. Felson, FELSON & FELSON, Cincinnati, Ohio, for Appellant. John A. Edmond, GUERRIERI, EDMOND & CLAYMAN, Washington, D.C., John B. Lewis, Thomas J. Piatak, ARTER & HADDEN, Cleveland, Ohio, for Appellees.

---

## OPINION

---

CLAY, Circuit Judge. Plaintiff, Kenneth Smoot, appeals from the district court orders granting Defendants, United Transportation Union ("UTU") and CSX Transportation, Inc. ("CSX"), summary judgment on Plaintiff's claims of conspiracy in violation of the Railway Labor Act ("RLA"), 45 U.S.C. § 153, and awarding Defendants $250,000 in statutory damages, $100,000 in punitive damages, and $86,308.74 in attorneys' fees and costs pursuant to Defendants' counterclaims under the Federal Wiretap Act (the "Act"), 18 U.S.C. § 2510 *et seq*. We **AFFIRM IN PART** and **REVERSE IN PART**, and **REMAND** for redetermination of damages.

## BACKGROUND

### I. Procedural History

In January of 1992, Plaintiff petitioned UTU General Chairman V.V. Elswick to represent him in a grievance action to recover thirty shares of CSX common stock which Plaintiff claimed were owed to him under a labor agreement between

---

transcript would not be in violation of the Act, because unlike in *Smith*, CSX actively and successfully opposed Plaintiff's filing of the transcript. Thus, the public record exception under *Smith* does not affect admissibility of the transcript under § 2515.

Second, in *Murdock*, this Court emphasized that the "clean hands" exception only applied to situations where the victim, not the perpetrator, of an unlawful interception was not precluded from using evidence "that literally falls into its hands." *Murdock*, 63 F.3d at 1403. Plaintiff, as the perpetrator under the Act, cannot avail himself of the clean hands exception under *Murdock*.

We find that neither the public record exception nor the clean hands exception would have prevented disclosure of the executive session transcript from violating the Act. Therefore, under § 2515, the transcript would not have been admissible at trial. Accordingly, the district court did not err in failing to consider the transcript when granting Defendants summary judgment.

## CONCLUSION

We **AFFIRM IN PART** and **REVERSE IN PART** the district court's orders. We affirm the order granting Defendants summary judgment on Plaintiff's claims of conspiracy in violation of 45 U.S.C. § 153 and awarding $86,308.74 in attorneys' fees and costs pursuant to Defendants' counterclaims under the Act, 18 U.S.C. § 2510 *et seq*. We reverse the award of $250,000 in statutory damages under § 2520(c)(2)(B) to Defendants, which should instead, under the *Desilets* rule, be limited to $10,000 for each Defendant, and **REMAND** the determination of punitive damages awarded Defendants in light of the reduction of statutory damages under § 2520(c)(2)(B).

court's grant of summary judgment *de novo*. *See Telespectrum, Inc. v. Pub. Serv. Comm'n of Kentucky*, 227 F.3d 414, 419 (6th Cir. 2000). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

"[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)(citations omitted). The district court did not err in failing to consider the executive session transcript when ruling on summary judgment because the transcript would have been inadmissible at trial. An evidentiary provision of the Act, 18 U.S.C. § 2515, states:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter.

Plaintiff's response to this provision is that disclosure of the transcript would not have been in violation of the Act, and thus receiving the transcript into evidence would not have violated § 2515. Plaintiff offers two grounds for this position. First, the public record exception under *Smith* provides that once the transcript had entered the public record, subsequent disclosure would not be in violation of the Act. Second, this Court should apply the "clean hands" exception, under *United States v. Murdock*, 63 F.3d 1391 (6th Cir. 1995), to permit admission of the executive session transcript under § 2515.

First, as discussed above, *Smith* does not support Plaintiff's claim that once the executive session transcript had been entered into the public record, subsequent distributions of the

UTU and CSX. Elswick informed Plaintiff that he did not qualify for the shares because he was not in active service as a trainman as of November 30, 1991, a required condition, according to Elswick, for distribution of CSX shares under the labor agreement. Plaintiff appealed Elswick's determination to the UTU Board of Appeals, the union's internal appeals board. The Board of Appeals ruled that Plaintiff was entitled to the thirty shares of stock and instructed Elswick to proceed with Plaintiff's claim. Elswick removed himself from the action and appointed UTU Vice-Chairman Robert Earley to represent Plaintiff in arbitration proceedings.

On May 6, 1993, Public Law Board No. 3882 ("PLB"), a private arbitration panel created pursuant to the RLA, convened a hearing at the Baltimore, Maryland offices of CSX to consider whether Plaintiff was entitled to the distribution of CSX stock under the labor agreement. Prior to the start of the hearing, the three PLB members, Earley, as UTU representative for Plaintiff, Howard Emerick, as the Senior Director of CSX, and H. Raymond Cluster, as PLB Chair and neutral arbitrator, requested that everyone else leave the room so that they could hold an executive session. Executive sessions are held at PLB hearings to discuss pending cases, resolve procedural matters, or determine matters remaining from previous PLB hearings. Plaintiff, who had brought two tape recorders with him to record the PLB proceedings, left the recorders in the room while the executive session was held. The executive session was then recorded, unbeknownst to the PLB members, the tape of which Plaintiff listened to following the hearing. On July 15, 1993, the PLB decided that Plaintiff was not entitled to the shares of CSX stock under the labor agreement.

## A. Internal Union Actions Against Earley

On December 15, 1993, Plaintiff filed internal union charges against Earley. Plaintiff wrote to K.N. Thompson, Chair of the UTU's Executive Board, presenting formal

charges against Earley for breach of duty of good faith and fair dealing as a union representative at the PLB hearing. On January 19, 1994, Earley was notified by the Executive Board that it would proceed with the charges brought against him by Plaintiff. A disciplinary hearing was set for March 23, 1994.

On March 28, 1994, Lance E. Ruck, a member of the UTU, filed a charge with the executive board against Earley after reviewing both tape and transcript copies of the executive session. *See Earley v. Executive Bd. of the UTU*, 957 F. Supp. 997, 999 (N.D. Ohio 1996). In that charge, Ruck alleged that Earley argued against the official position of the UTU in the executive session. He also alleged that Earley therefore failed to perform his duties as required by the UTU. Ruck stated that his claims against Earley were for the same wrongdoing as those alleged by Plaintiff.

## B. Earley Action Against Plaintiff

On March 14, 1994, Earley filed an action against Plaintiff in the United States District Court for the District of Maryland requesting declaratory and injunctive relief on grounds that Plaintiff's taping of the executive session violated the Act as well as the Maryland anti-wiretapping statute, MD. CTS. & JUD. PROC. CODE ANN., § 10-401 *et seq*. On March 16, 1994, Earley moved for a temporary restraining order to prohibit Plaintiff from using or disclosing the substance of the executive session tapes at a trial before the Executive Board. On March 22, 1994, the district court issued a preliminary injunction prohibiting Plaintiff from participating in the UTU internal proceedings against Earley. *See Earley v. Smoot*, 846 F. Supp. 451, 454 (D. Md. 1994). Plaintiff was further ordered to refrain from using the executive session tapes except in connection with his defense against Earley's action under the Act. *See Executive Board*, 957 F. Supp. at 999. The district court then transferred the action to the United States District Court for the Northern District of Ohio. *Id*. On October 29, 1996, the district court entered a permanent injunction prohibiting Plaintiff from

most cases where punitive awards are granted, "punitive awards have been much higher than the compensatory awards." *Id*. at 228.

On the matter of attorneys' fees and costs, the Act provides that a prevailing party may receive "a reasonable attorney's fee and other reasonable costs reasonably incurred." 18 U.S.C. § 2520(b)(3). The district court held an attorneys' fees hearing on September 11, 1998. Plaintiff was given notice of the hearing, but did not attend. Plaintiff also filed no timely response to the attorneys' fees and costs applications filed by UTU and CSX. Because Plaintiff failed to object to the award of attorneys' fees below, under the waiver rule this Court will not consider Plaintiff's claim.[7]

We find that the district court did not abuse its discretion when awarding UTU and CSX punitive damages under § 2520(b)(2) on the grounds that Plaintiff attempted to damage the reputation of CSX and UTU, as well as Plaintiff's 1997 distribution of the transcript, which followed preliminary and permanent injunctions prohibiting such action. However, the amount of punitive damages should be reexamined on remand in light of the reduction in statutory damages available under § 2520(c)(2)(B). We also find that Plaintiff's claim on attorneys' fees is procedurally defaulted.

## V. Admissibility of Executive Session Transcript

Plaintiff argues that the district court erred when not considering the executive session transcript before granting Defendants summary judgment. This Court reviews a district

---

[7]The Supreme Court has provided that "[o]rdinarily an appellate court does not give consideration to issues not raised below." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941). "The purpose behind the waiver rule is to force the parties to marshal all of the relevant facts and issues before the district court, the tribunal authorized to make findings of fact." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 325 (6th Cir. 1999), *cert. denied*, 528 U.S. 871 (1999).

of the transcript, which occurred after Plaintiff had been put on notice that disclosure of the contents of the executive session was illegal. Notice had been provided by the permanent injunction that was vacated on January 31, 1997, prior to the 1997 distribution.

Plaintiff argues that the district court failed to show how CSX's reputation was damaged by distribution of the transcript. However, Plaintiff's complaint alleged that CSX and UTU, working together, lobbied the PLB arbitrator to structure the stock award so as to deny Plaintiff's claim to the CSX stock. Plaintiff offers no basis for his position that alleging CSX collusion with UTU to deny Plaintiff's rights under the labor agreement was not damaging to CSX's reputation. The district court concluded that Plaintiff had indeed damaged CSX's reputation both by his allegations and by attaching the executive session transcript to his complaint. We find this conclusion not to be clearly erroneous, due both to the severity of Plaintiff's allegations and Plaintiff's failure to articulate how inferring harm to reputation from such allegations was in fact in error.

Plaintiff next argues that prior notice of the illegality of the 1997 distribution was an improper basis for awarding punitive damages because the public record exception shielded Plaintiff from liability as to the 1997 distribution. However, as discussed above, the public record exception under *Smith* does not shield Plaintiff from liability for the 1997 distribution of the transcript.

Finally, Plaintiff argues that a reduction in statutory damages should result in a corresponding reduction in punitive damages. Plaintiff again cites no law in support of this position. Because the award of punitive damages is within the discretion of the trial court, we remand the question of whether punitive damages in this case should be reduced in light of the reduction in statutory damages under § 2520(c)(2)(B). *See Smith v. Heath*, 691 F.2d 220, 226 (6th Cir. 1982). We only note that this Court has found that in

using or disclosing the tape recording of the executive session, which was subsequently vacated on January 31, 1997. *Id*. at 1000-1002. The district court found that Plaintiff had intentionally recorded the executive session in violation of the Act.

### C.  Plaintiff Action Against CSX and UTU; CSX and UTU Counterclaims

On March 7, 1994, Plaintiff filed his complaint in this action, alleging that the PLB decision should be set aside, that the UTU breached its duty of fair representation, and that CSX breached the labor agreement. Plaintiff attached a transcript copy of the executive session tapes as Exhibit A to his complaint. On April 25, 1994, the UTU filed a counterclaim, alleging that Plaintiff violated the Act by taping the executive session and subsequently disclosing and using the illegally intercepted communications. On May 4, 1994, CSX also filed a counterclaim under the Act.

Also on May 4, 1994, CSX filed a motion to strike Exhibit A from Plaintiff's complaint, or, in the alternative, to seal the exhibit. On May 18, 1994, the district court held a case management conference, at which Plaintiff agreed to withdraw Exhibit A from his complaint.

Subsequently, both UTU and CSX filed motions for summary judgment, to which Plaintiff filed responses *pro se*. On February 16, 1995, new counsel made an appearance on behalf of Plaintiff. Counsel filed supplemental briefs in opposition to the motions for summary judgment.

On January 28, 1998, the district court granted summary judgment in favor of UTU and CSX as to Plaintiff's claims. The district court held that the PLB award should not be set aside under the limited standard of review governing arbitration awards under the RLA. The district court also found no material facts in dispute to support a claim that the UTU had breached its duty of fair representation.

On March 30, 1998, the district court conducted a bench trial on the UTU and CSX counterclaims under the Act. The district court found that Plaintiff was not credible and had intentionally recorded the executive session and then distributed the illegal interception in violation of the Act. The district court awarded $130,000 and $120,000 in statutory damages to UTU and CSX respectively, in connection with thirteen violations committed by Plaintiff under the Act. The district court also found that Plaintiff's violations were willful, wanton and reckless, and thereby awarded UTU and CSX $50,000 each in punitive damages pursuant to 18 U.S.C. § 2520(b), as well as finding UTU and CSX entitled to reasonable attorneys' fees and costs under § 2520(b).

UTU and CSX filed motions for attorneys' fees. On September 9, 1998, two days before the date set for the hearing on attorneys' fees, Plaintiff filed an opposition to the UTU and CSX requests. The district court determined that Plaintiff's response was not timely. On September 11, 1998, the district court held a hearing on attorneys' fees, which Plaintiff failed to attend. On September 25, 1998, the district court awarded CSX $25,874.31 in fees and costs. On October 8, 1998, the district court awarded UTU $60,434.43 in fees and costs. On October 28, 1998, Plaintiff filed his notice of appeal, appealing from the district court's awards of summary judgment, statutory and punitive damages, as well as attorneys' fees and costs in favor of Defendants.

## II.  Substantive History

Plaintiff is employed by CSX, a Virginia corporation, and is a member of UTU, an unincorporated labor organization headquartered in Cleveland, Ohio. In October of 1989, UTU and CSX negotiated a new labor agreement which included a provision for the contribution of thirty shares of CSX common stock into the retirement plan account of train service employees who satisfied the eligibility rules under the labor agreement.

statutory damages under § 2520(c)(2)(B) should be limited to $10,000 for CSX and $10,000 for UTU.[6]

## IV.  Punitive Damages/Attorneys' Fees

18 U.S.C. § 2520(b)(2) of the Act expressly permits the award of punitive damages when the aggrieved party demonstrates that a "wanton, reckless or malicious violation" of the Act has occurred. *See Dorris*, 179 F.3d at 428; *Bess*, 929 F.2d at 1335. The district court awarded UTU and CSX $50,000 each in punitive damages under § 2520(b)(2), as well as $60,434.43 to UTU and $25,847 to CSX in attorneys' fees and costs under § 2520(b)(3). Plaintiff argues that the district court erred in granting these awards.

This Court reviews district court determinations on the amount of punitive damages, and the awarding of attorneys' fees, for an abuse of discretion. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000). "A district court abuses its discretion when it relies on clearly erroneous findings of fact . . . or when it improperly applies the law or uses an erroneous legal standard." *Id*. at 597. Under this standard, this Court must review the district court's legal conclusions *de novo* and its factual findings for clear error. *Id*.

The district court based its award of punitive damages primarily on two grounds: first, Plaintiff attempted to damage UTU's and CSX's reputations; second, the 1997 distribution

---

[6]The district court found that Plaintiff "committed thirteen violations" of the Act. (J.A. at 602.) If these thirteen violations had occurred on more than 100 separate days, damages under § 2520(c)(2)(B) would have been $100 for each such day. However, because these thirteen violations were linked to particular actions on particular days, including two violations on May 6, 1993 (intentional interception and intentional use), and two violations on October 6, 1993 (distribution of transcript to Dubose and Sargent), the thirteen violations did not occur on more than 100 separate days. Accordingly, damages under § 2520(c)(2)(B) are limited to $10,000 per claimant.

[plaintiff's] part that the transcripts should not be part of the public record." *Smith*, 129 F.3d at 359 n. 1. Conversely, in this case CSX opposed Plaintiff's filing of the executive session transcript, which Plaintiff then agreed to withdraw from the record. Further, both *Spatafore* and *Fleming* concerned admission into evidence of legally obtained wiretap evidence that had already been made part of the public record in prior criminal prosecutions. *Fultz* referenced the legislative history of the Act, which stated that disclosure of intercepted communication that had already become "public information" or "common knowledge" would not violate the Act. *Fultz*, 942 F.2d at 403 (citations omitted). However, *Fultz* did not address the relationship between court filings and those categories. Neither *Smith*, nor the cases on which it relied, support Plaintiff's claim that filing the executive session transcript with the district court for three months in 1994, which CSX actively and successfully opposed, barred liability for subsequent distributions of the transcript. We find that *Smith* does not shield Plaintiff from liability for the 1997 distribution.

Third, Plaintiff argues that the district court erred in holding him liable for the distribution of illegally intercepted materials by Ruck. However, Plaintiff has not identified which of the thirteen discrete violations found by the district court should have given rise to Ruck's, rather than Plaintiff's, liability. This Court deems issues presented in a perfunctory manner on appeal to have been waived. *See U.S. v. Hayter Oil Co.*, 51 F.3d 1265, 1269 (6th Cir. 1995).

We find, for the above stated reasons, that the district court erred in applying the $10,000 liquidated damages amount under § 2520(c)(2)(B) per violation of the Act. We also find, however, that Petitioner's attempt to further reduce liability by reference to the defense, adjudication, and public record exceptions, as well as actions by Ruck, is unavailing. Accordingly, in light of our adoption of the *Desilets* rule,

In 1991, Plaintiff held both train and engine service seniority with CSX. As of November 30, 1991, Plaintiff was employed in engine service, but not train service, which Elswick interpreted as precluding Plaintiff's eligibility for the CSX stock distribution under the labor agreement.

The May 6, 1993 PLB hearing was held to determine Plaintiff's eligibility for the CSX stock. Plaintiff brought two tape recorders to the hearing, to record the proceedings. At trial, there was conflicting testimony as to whether Plaintiff set the tape recorders on the table in front of him. No one else at the hearing saw or was aware of the tape recorders. Plaintiff testified that when he was told to leave the room, so that the PLB members could hold the executive session, he placed all of his belongings, including the tape recorders, in a bag which he left in the room where the executive session was then held. The tape recorders, inside Plaintiff's bag, recorded the executive session. Plaintiff did not request permission from anyone to record either the PLB hearing or the executive session.

On his way home from the hearing, Plaintiff listened to the tape recordings of the executive session. Plaintiff later played the tapes for Howard Goodloe, Joe Ely and Danny Mills, three members of UTU Local 662 located in Virginia. Plaintiff later called Ruck, a UTU member in Texas, and told him about the tapes. In June of 1993, Plaintiff sent Ruck a copy of the tapes.

Several months later, Plaintiff made arrangements to have the tapes transcribed by a court reporter in Virginia. On October 6, 1993, Plaintiff sent copies of the transcript to G. Thomas DuBose, International President of the UTU, at his office in Cleveland, Ohio, and to another UTU official, R.K. Sargent, in an attempt to have UTU investigate Earley's conduct. Dubose determined that there was nothing improper in Earley's conduct. Plaintiff also provided copies of the transcript to Thompson, located in Missouri, in support of his internal union filing. Plaintiff also provided a copy of the

transcript to his attorney, in Kentucky, who then attached the transcript to Plaintiff's complaint in this case.

In August of 1997, Plaintiff distributed the transcript to UTU members attending a UTU convention in Atlanta.

## DISCUSSION

### I. Standing

Plaintiff argues that neither CSX nor UTU had standing to bring claims under the Act. 18 U.S.C. § 2520 provides for civil relief under the Act for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter". 18 U.S.C. § 2510 defines "person" as "any individual, partnership, association, joint stock company, trust, or corporation". Whether a claimant has standing under the Act is a question of law which this court reviews *de novo. See United States v. Bridwell's Grocery and Video*, 195 F.3d 819, 821 (6th Cir. 1999).

### A. CSX Standing

Plaintiff argues that CSX did not have standing to bring its counterclaim because there was no evidence that the recorded executive session concerned CSX business. However, this claim is inconsistent with the record, including Plaintiff's own complaint. Plaintiff secretly tape recorded Emerick, CSX's Senior Director of Employee Relations, at the PLB executive session. Emerick was CSX's designated representative on the PLB. Emerick's job duties included representing CSX at PLB meetings. At the executive session, Emerick was meeting with two other persons, on CSX property, to adjust grievances by CSX employees. Plaintiff's own complaint stated:

All actions taken by Mr. Emerick as a member of PLB 3882 were within the scope of Mr. Emerick's employment with CSX; also Mr. Emerick performed all

defending against charges brought under the Act.[5] *See Nix*, 160 F.3d at 351.

Second, Plaintiff's filing of the executive session transcript with the district court in March of 1994 does not, under *Smith*, shield Plaintiff from liability in connection with the 1997 distribution. The *Smith* court found as follows:

Although the [Act] provides for a separate cause of action for each individual disclosure of an unlawfully intercepted communication, it does not proscribe the disclosure of information that has become part of the public record.

*Smith*, 129 F.3d at 363 (citing *Fultz v. Gilliam*, 942 F.2d 396, 403 (6th Cir. 1991); *Spatafore v. United States*, 752 F.2d 415, 418 (9th Cir. 1985); *Fleming v. United States*, 547 F.2d 872, 874 (5th Cir. 1977)).

Plaintiff argues that because the executive session transcript became part of the public record when he filed the transcript with his complaint, Plaintiff is not liable, under *Smith*, for the subsequent 1997 distribution. However, in response to CSX's motion to strike the transcript from Plaintiff's complaint, the transcript was removed from the record in May of 1994. Even assuming that this Court in *Smith* understood "information that has become part of the public record" to include information that was publically available for three months in 1994, the public record exception under *Smith*, *Fultz*, *Spatafore*, and *Fleming* does not shield Plaintiff from liability in this case.

In *Smith*, plaintiff had not opposed a motion by the Securities and Exchange Commission to unseal transcripts filed with the United States District Court for the Central District of California, "thereby obviating any argument on

---

[5]The charges against Plaintiff only arose in the CSX and UTU counterclaims in response to Plaintiff's complaint.

intentional use.  A particular defendant's liability under § 2520(c)(2)(B) should not turn on the consistency or variety of his violations.  While measuring damages by days of violation does create the possibility of treating different defendants similarly (since single and multiple violations on any given day both count as one), at least this imbalance arises from the plain language of § 2520(c)(2)(B), rather than treating one disclosure and one use differently from two interceptions, a position whose statutory foundation we have not been able to divine.

By following the *Desilets* understanding of § 2520(c)(2)(B), we answer the unexplored question in *Dorris*, whether violations of the Act "widely separated by time, place, or people" would lead to a result different from applying the $10,000 liquidated damages amount per claimant rather than per violation. *Dorris*, 179 F.3d at 428.  Thus, the provisional "interrelated and time-compacted" qualifier in *Dorris* need not apply to questions of damages under § 2520(c)(2)(B); rather, the straightforward rule of *Desilets*, that a claimant may be awarded more than $10,000 in damages under § 2520(c)(2)(B) only if violations of the Act occurred on more than one hundred separate days, may now control.  The $10,000 liquidated damages amount under § 2520(c)(2)(B) is designed to compensate a claimant for all of a transgressor's misdeeds under the Act, unless that transgressor has violated the Act on more than one hundred separate days, in which case compensation is $100 for each such day.

While adopting the *Desilets* rule will reduce Plaintiff's liability in this case, Plaintiff is not further assisted by any of the various liability exceptions that he has argued on appeal. First, the defense and adjudication exceptions under *Nix* do not apply to Plaintiff's distribution of the executive session transcript to his lawyer or the attachment of the transcript to Plaintiff's complaint because Plaintiff was not, at that time,

acts referred to herein with the full cloak of authority and with complete agreement and acquiescence of CSX in all actions he took as a member of PLB 3882.  Finally, all actions of Mr. Emerick's and the consequences thereof are directly imputable to CSX.

(J.A. at 23.)

CSX cites two cases in support of organizations having standing to bring claims under the Act.  In *Hatchigian v. Local Union No. 98*, No. 87-7131, 1988 U.S. Dist. LEXIS 10813 (E.D. Pa. Sept. 27, 1988), the court found that a labor union had standing to bring a claim under § 2510 on the following grounds:

> [D]efendant Local 98 of the International Brotherhood of Electrical Workers also has standing.  "Person" is defined by [§ 2510] to include . . . any "association," thereby including a union local . . . The use of the term "whose" in the statute . . . confers standing upon those who have a possessory interest in the communication. [Individual defendant] Mackin was the local's business manager.  The conversation allegedly took place over a union telephone and concerned the local's affairs.  Under these alleged circumstances, the local had a possessory interest in the communication sufficient to confer standing upon it.

*Hatchigian*, 1988 U.S. Dist. LEXIS 10813, at *2.

CSX also cites *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F. Supp. 808 (D.N.J. 1993), which, although finding the union not to have standing to bring a claim under § 2510, did so on grounds that the union did not have an identifiable injury under the Act.  Specifically, there was no evidence that any conversations related to union activity had actually been intercepted ("[w]here there has been no interception, there can have been no injury").  *PBA Local No. 38*, 832 F. Supp. at 822 (citation omitted).  In this case, Plaintiff not only attached the intercepted conversation to his

complaint, he then went on to specifically allege that Emerick's intercepted conduct was in fact CSX conduct.

Plaintiff argues that *PBA Local No. 38* and *Hatchigian* do not cure one particular flaw in CSX's standing argument: no evidence has shown the contents of the intercepted conversation to have belonged to CSX, and thus no evidence has established that CSX was a person "whose" communication was intercepted under § 2520. However, if CSX does not have a possessory interest in the confidential statements made by its Senior Director of Employee Relations, acting as the designated representative for CSX on the PLB, at the executive session portion of a PLB proceeding held on CSX property, regarding grievance adjustments by CSX employees, then it is difficult to conceive of a corporation or association ever having standing under the Act. We find that CSX, as a corporation, had standing to bring its counterclaim as a person whose communication was intercepted and disclosed in violation of the Act under 18 U.S.C. § 2520.

## B.  UTU Standing

Plaintiff also argues that UTU did not have standing to bring a claim under the Act, in that Earley was acting in a specially designated independent capacity at the executive session as to union-management negotiations over the shares of stock.  Specifically, Plaintiff argues that because Earley was the UTU representative for Plaintiff at the meeting, then Earley could not have been acting at that time as a UTU agent.

Plaintiff cites no law in support of the position that when a Vice President of a union represents a union member in a union-management negotiation, that Vice President ceases to act on behalf of the union.  Plaintiff does reference an affidavit by Emerick to support his position that Earley was not acting as agent for UTU at the PLB meeting.  However, the Emerick affidavit clearly stated that Earley did not cease

Moreover, *Deal* and *Campiti* found days or weeks, not months, of activity to have occurred within one discrete violation.

Upon review of pertinent case law, we find it implausible that more than one hundred "days of violation" would fall under one overarching violation of the Act.  Because such an implausibility would be required under a "per violation" reading of § 2520(c)(2)(B) that nevertheless retained meaning for the "$100 a day" provision, we find that the $10,000 liquidated damages amount under § 2520(c)(2)(B) should not be applied per violation of the Act.

We also agree with the First Circuit that liquidated damages under § 2520(c)(2)(B) should not be awarded per type of violation of the Act. "Certainly, each interception separately injures a victim, as does each disclosure, and each intentional use of intercepted conversations.  But [§ 2520(c)(2)(B)] describes only one inclusive method for calculating damages."  *Desilets*, 171 F.3d at 714.  We find it counterintuitive that multiple interceptions by one defendant on multiple days could collectively give rise to one award of liquidated damages, while one day of isolated actions, by that same defendant, of one interception, one disclosure, and one intentional use, could give rise to three.  Therefore, we agree with the First Circuit in *Desilets* that statutory damages under § 2520(c)(2)(B) should depend only on the number of days on which the Act was violated, rather than on whether the Act was violated by a prohibited interception, disclosure, or

---

violations, each amounting to a separate injury prohibited by the Act, may occur on any given day, although the only factor material to statutory damages determinations under § 2520(c)(2)(B) is whether a violation occurred on more than one hundred separate days); *Bess*, 929 F.2d at 1333 (thirteen violations from twelve days of interception and one day of distribution).  *See also Romano v. Terdik*, 939 F. Supp. 144, 150 (D. Conn. 1996)(separate violations for each conversation that was illegally intercepted or disclosed); *Shaver v. Shaver*, 799 F. Supp. 576, 579 (E.D.N.C. 1992)(two violations from two days of interceptions).

We are required to construe the language of a statute so as to avoid making any word meaningless or superfluous. *See Fulps v. City of Springfield*, 715 F.2d 1088, 1093 (6th Cir. 1983)(citing *Yamaguchi v. State Farm Mutual Auto Insurance Co.*, 706 F.2d 940, 947 (9th Cir.1983); *Zimmerman v. North American Signal Co.*, 704 F.2d 347, 353 (7th Cir.1983)). Therefore, we must consider the meaning of the "$100 a day for each day of violation" provision within the statutory damages scheme of § 2520(c)(2)(B).

Congress, in its 1986 amendment to § 2520, raised the minimum liquidated damages amount from $1,000 to $10,000, but left the "$100 a day for each day of violation" provision unchanged. If the $10,000 amount were to be applied per violation, the only way for the "$100 a day" provision to retain meaning, that is, to possibly result in an award of damages greater than $10,000, would be if over one hundred "days of violation" were somehow included within one discrete violation of the Act. Some courts have understood "violation" in a manner that may be consistent with such an approach, finding several days of prohibited activity to constitute one violation.[3] However, finding multiple days of prohibited activity as falling under one violation is directly contrary to this Court's decision in *Dorris*, as well as the First Circuit in *Desilets* and the Eighth Circuit in *Bess*, which all found violations corresponding to particular actions or to several actions on a particular day.[4]

---

[3] *See Deal v. Spears*, 980 F.2d 1153, 1156 n.5 (8th Cir. 1992)(two violations per defendant, one for interception of twenty-two hours of taped conversations recorded over a six-week period and one for an isolated disclosure of the content); *Campiti v. Walonis*, 467 F. Supp. 464, 466 (D. Mass. 1979)(one violation from "interceptions and disclosures [that] were incidents of one single investigation which took place within a ten-day period").

[4] *See Dorris*, 179 F.3d at 424 (five violations from particular actions of one interception, two disclosures, and two intentional uses of the intercepted content); *Desilets*, 171 F.3d at 714 (an unlimited number of

to be a UTU representative when representing Plaintiff at the meeting:

> [Chairman] Cluster then called upon the UTU to proceed. Mr. Earley proceeded to present [Plaintiff's] claim . . . . The UTU representatives, Earley, Elswick and Sargent, along with [Plaintiff] left the room for about ten minutes and when they returned . . . Earley asked on behalf of [Plaintiff] whether [Plaintiff] could submit post hearing information.

(J.A. at 230.) Plaintiff offers no authority in support of his position that representing union members is not part of the work of union representatives. Absent such authority, we find that Earley's role at the PLB meeting as UTU representative for Plaintiff, rather than as UTU representative *per se*, does not sever the agency relationship between Earley and the UTU. Just as Plaintiff, in his complaint, imputed Emerick's actions at the PLB meeting to CSX, Earley's actions, as UTU representative, are imputable to UTU. Therefore, UTU, an association, had standing as a person whose communication was intercepted and disclosed in violation of the Act under 18 U.S.C. § 2520.

## II. Substantial Evidence

Plaintiff argues that the district court's finding that Plaintiff intentionally recorded the PLB executive session was against the weight of the evidence. This Court reviews a district court's factual findings on intent under a clearly erroneous standard. *See West v. Fred Wright Construction Co.*, 756 F.2d 31, 34 (6th Cir. 1985). A finding of fact will be deemed clearly erroneous only where it is against the clear weight of the evidence or when upon review of the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed. *Id*. (citations and internal quotations omitted). "When factual findings rest upon credibility determinations, this Court affords great deference

to the findings of the district court." *Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999).

The following facts are undisputed. Plaintiff brought two tape recorders to the PLB hearing to have a complete record of the proceedings. Plaintiff turned the recorders on prior to the start of the PLB hearing, without requesting or receiving permission from anyone to record the proceedings. The PLB members did not give Plaintiff permission to record their discussion during the executive session. Plaintiff, upon being told by the PLB members to leave the room so that the executive session could be held, left his bag in the hearing room, which contained the tape players that recorded the executive session. When finding, on these facts, that Plaintiff intended to intercept oral communications made during the executive session, the district court noted:

> [Plaintiff] testified at trial that he inadvertently left the tape recorders on during the Executive Session . . . . This Court, however, did not find [Plaintiff] to [be] a credible witness . . . . Several times during his testimony, [Plaintiff] was impeached with his own answers to Defendant CSX's Request for Admissions and the Statement of Admitted or Stipulated Facts. This Court does not credit [Plaintiff's] testimony that he did not intentionally intercept, disclose, and use the communications made during the Executive Session of the Public Law Board. This Court did find the trial testimony of Howard Emerick, Robert Earley, and Kim Thompson credible. Accordingly, all conflicting testimony is resolved against [Plaintiff].

(J.A. at 605.)

Plaintiff's testimony conflicted with the testimony of Earley and Emerick. Plaintiff testified that he placed the tape recorders on the table in the hearing room before the start of proceedings. Earley and Emerick testified that they did not see any tape recorders at any time. Earley stated, "At the

damages under the former § 2520. On appeal, the *Bess* court found that an additional violation occurred in 1995, which raised the total number of violations to thirteen. The *Bess* court awarded claimant an additional $100 in damages, bringing claimant's total statutory damages under § 2520 to $1,300. *Id.* at 1334.

The *Bess* court did not consider whether the additional violation, which occurred two years after the twelve 1993 violations, might have entitled claimant to an additional $1,000, rather than $100, under the former § 2520. Although the *Bess* court noted that claimant made "no argument that the statute entitled her to more than the $100 per day figure", *Bess*, 929 F.2d at 1334 n.1, the *Desilets* court interpreted this statement as referring to the possibility of collecting more than $100 per day because the violation on the additional day was of a different type, being a disclosure rather than an interception. *Desilets*, 171 F.3d at 715. Given claimant's statutory award in *Bess*, and the *Bess* court's ambiguous note that claimant had only argued for the $100 per day figure, we agree with the First Circuit in *Desilets* that if *Bess* supports any view on statutory damages under § 2520(c)(2)(B), it supports a view consistent with the *Desilets* rule that a claimant may be awarded over $10,000 in statutory damages only if violations of the Act occurred on more than one hundred separate days.

We find that the $10,000 liquidated damages amount under § 2520(c)(2)(B) is not to be applied per violation of the Act, for three reasons. First, the precedential support of *Dorris, Desilets* and *Bess*. Second, as this Court explained in *Dorris*, the $10,000 amount under § 2520(c)(2)(B), unlike the $100 amount, has no "per violation" authorization. "Congress knows how to specify an award that is to be multiplied on the basis of the frequency of the violation, because it did so by providing for damages of $100 per day for each day of violation." *Dorris*, 179 F.3d at 428. Third, as detailed below, applying the $10,000 amount per violation would render the "$100 a day" provision meaningless.

171 F.3d 711 (1st Cir. 1999), the First Circuit held that, for each claimant, statutory damages under § 2520(c)(2)(B) are limited to $10,000 unless violations of the Act occurred on more than one hundred separate days. The *Desilets* court found that an Eighth Circuit case, *Bess v. Bess*, 929 F.2d 1332 (8th Cir. 1991), did not support a per violation application of statutory damages under § 2520(c)(2)(B). Specifically, the *Desilets* court found the following:

> The *Bess* court did not hold that interception and disclosure by the same person warrants multiple liquidated awards under the Act. If the opinion in *Bess* supports any view, it supports a view consistent with our own interpretation of the damages provision: that the number of days of violation determines the amount of a liquidated damages award, and not the number of discrete violations on any given day, nor the different types of violations that might occur.

*Desilets*, 171 F.3d at 715.

We agree that *Bess* is consistent with the *Desilets* rule that statutory damages under § 2520(c)(2)(B) are limited to $10,000 unless violations of the Act occurred on more than one hundred separate days. Claimant's action in *Bess* was brought prior to the 1986 amendment to the Act.[2] Under the former § 2520, a claimant could collect statutory damages equal to the greater of $100 per day of violation or $1,000. The 1986 amendment to § 2520 raised the $1,000 liquidated damages amount to $10,000. Claimant in *Bess* had introduced twelve tapes of intercepted phone conversations, each tape representing one day of interception. *Bess*, 929 F.2d at 1333. The interceptions occurred in 1993. The magistrate judge, finding the interceptions to have occurred on twelve separate days, awarded claimant $1,200 in statutory

---

[2]Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1853 (1986).

commencement of the hearing, the only thing that was on the table was the tablets, the briefs that were filed, and pens and pencils." (J.A. at 688.) Earley responded specifically that he did not see any tape recorders on the table during the hearing. Emerick testified that at the hearing he sat "almost directly across" the narrow end of the table, "probably no more than four feet" from Plaintiff. (J.A. at 720.) Emerick also testified that he did not see any tape recorders on the table, which, had they been there, he would "assuredly" have been able to see. (J.A. at 721.) The district court, as it expressly stated, resolved the conflicting testimony on whether Plaintiff had placed the tape recorders on the table in front of him against Plaintiff.

Given the conflicting testimony on whether Plaintiff initially placed the tape recorders in plain sight, the suspicious circumstances of leaving a bag containing running recorders in a meeting room that Plaintiff had been asked to leave, and the deference this Court affords district court credibility determinations, we find the district court's determination that Plaintiff intended to record the executive session not to have been clearly erroneous.

### III. Statutory Damages

Plaintiff argues that the district court's award of $250,000 in statutory damages to Defendants was in violation of 18 U.S.C. § 2520(c)(2)(B) as well as several exceptions to damages recognized by this Court. Specifically, Plaintiff argues that: (i) under *Dorris v. Absher*, 179 F.3d 420 (6th Cir. 1999), § 2520(c)(2)(B) establishes a "single-sum" $10,000 statutory award per claimant; (ii) under *Nix v. O'Malley*, 160 F.3d 343 (6th Cir. 1998), the adjudication and defense exceptions should have shielded Plaintiff from liability as to Plaintiff's distribution of the transcript to his lawyer and the attachment of the transcript to his complaint; (iii) under *Smith v. Securities and Exchange Commission*, 129 F.3d 356 (6th Cir. 1997), Plaintiff's filing of the executive session transcript with the district court in March of 1994 should have shielded

Plaintiff from liability as to the 1997 distribution; and (iv) Plaintiff should not be liable for any disclosure by Ruck, who was not Plaintiff's agent. This Court reviews a district court's award of damages based on statutory interpretation *de novo*. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997).

The compensatory damages provision of the Act, 18 U.S.C. § 2520(c), reads as follows:

(c) computation of damages.

(2)  In any other action under this section, the court may assess as damages whichever is the greater of–
(A)   the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or
(B)   statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

This Court in *Dorris* held that under § 2520(c)(2)(B), the $10,000 liquidated damages amount may not be applied per violation of the Act if the violations are "sufficiently interrelated and time-compacted". *Dorris*, 179 F.3d at 428. Specifically, "the $10,000 is designed to compensate a plaintiff for all of the transgressor's misdeeds under the [Act] arising out of a closely related course of conduct that takes place over a relatively short period of time." *Id*. This Court in *Dorris* also noted, "[w]e need not decide whether violations of the [Act] widely separated by time, place, or people would lead to a different result, because the question is not currently before us." *Dorris*, 179 F.3d at 428. *Dorris* involved an eight-day span in which a director secretly recorded conversations among four employees, played the recording for his wife and two friends, and then terminated two of the employees based on information gained from the recordings.

Plaintiff argues, under *Dorris*, that his conduct was closely related and occurred over a relatively short period of time, and

thus his statutory damages should be limited to a single-sum of $10,000 per claimant under § 2520(c)(2)(B). Both UTU and CSX argue that Plaintiff's violations were widely separated by time, place, and people, requiring separate statutory awards under the *Dorris* reading of § 2520(c)(2)(B).

UTU argues that nine of Plaintiff's violations of the Act do not form a closely related course of conduct; eight of which occurring over a ten month period, and the ninth four years after Plaintiff's initial violation. Plaintiff's violations also occurred in six states, involving disclosure to at least eleven different persons.[1]

Unlike *Dorris*, the violations in this case did not occur over an eight-day span or involve a handful of people in one location. Rather, as detailed above, the violations occurred over a series of months and, in one case, years, involving multiple parties in multiple states. We therefore must address the "widely separated" question left unanswered by this Court in *Dorris*.

Currently, only one circuit has directly addressed, in the case of widespread violations of the Act, whether the $10,000 liquidated damages amount under § 2520(c)(2)(B) is to be applied per violation. In *Desilets v. Wal-Mart Stores, Inc.*,

---

[1] Plaintiff's initial interception of the executive session occurred on May 6, 1993, in Maryland. Plaintiff then took the tapes to Virginia, where he played them for three UTU members. In June of 1993, Plaintiff sent one of the tapes to Ruck in Texas. Several months later, Plaintiff disclosed the tape recordings to the Brightwell Reporting Service in Virginia, to make a transcript of the recording. After the transcript was produced, Plaintiff sent copies to UTU officials in Ohio. In December of 1993, Plaintiff sent a letter to Thompson, UTU Executive Board Chairperson, to initiate formal internal union charges against Earley. Plaintiff then provided a copy of the transcript to his attorney, in Kentucky, to pursue an action against UTU and CSX. In March of 1994, the transcript was attached to Plaintiff's complaint and filed with the district court. Plaintiff's final violation was in August of 1997 at a UTU convention, over four years after his initial violation.