# IN THE SUPREME COURT OF IOWA

No. 07–0330

Filed February 20, 2009

**IOWA BETA CHAPTER OF
PHI DELTA THETA FRATERNITY**,

    Appellee,

vs.

**STATE OF IOWA, UNIVERSITY OF IOWA,**
and **PHILLIP E. JONES**,

    Appellants.

---

Appeal from the Iowa District Court for Johnson County, Mitchell E. Turner, Judge.

The defendants appeal a decision finding them liable for damages under Iowa Code section 808B.8 (2001). **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Thomas J. Miller, Attorney General, and George A. Carroll, Assistant Attorney General, for appellants.

John M. Maher of Maher & Dolan Law Firm, P.L.C., Cedar Rapids, and James W. Affeldt of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellee.

**WIGGINS, Justice.**

The district court entered judgment in favor of the Iowa Beta Chapter of Phi Delta Theta Fraternity against the State of Iowa, the University of Iowa, and one of its employees, Phillip E. Jones, the vice president for student services and the dean of students. The fraternity based its claim on the defendants' use of an intercepted electronic communication in violation of Iowa Code section 808B.8 (2001). Because the fraternity is the real party in interest, has standing to bring this action, and substantial evidence supports the district court's finding of liability, we affirm the court's finding of liability. However, because we disagree with the court's findings on punitive and actual damages, we remand the case to the district court to enter judgment in this matter consistent with this opinion.

## I.  Background Facts and Proceedings.

When viewed in a light most favorable to the fraternity, the record supports the following facts. In the fall of 2000, Elmer Vejar became a pledged prospective member of the fraternity. However, because Vejar was unable to obtain the minimum grade point average set by the fraternity, the fraternity did not accept him as a member. The fraternity rented rooms in the fraternity house to nonmembers during the summer for income. The renters did not have access to the chapter meeting rooms, but did have access to other common areas of the house such as the kitchen, dining room, living room, and television room. All renters had to move out of the house prior to "work week," which is the week before rush activities commenced. Vejar rented a room as a nonmember in the summer of 2001.

The fraternity's meetings were confidential and held in a subbasement meeting room of the fraternity house. The fraternity

stationed wardens at the meeting room door to exclude nonmembers from entering or disturbing fraternity meetings. Because Vejar was no longer a pledge or a member, the fraternity did not allow him to attend meetings or other fraternity events, and he could not enter the private meeting rooms of the fraternity house.

In early October of 2001, Vejar made an oral complaint to Jones alleging the fraternity violated hazing and alcohol policies. Jones explained to Vejar he would not investigate until Vejar filed a formal, signed complaint and provided evidence to support the charges. Six or seven weeks later, Vejar filed a formal complaint and submitted a six-page statement and a two-and-a-half hour tape recording of an alleged hazing session. Vejar obtained the recording by concealing an audio-recording device in the chapter's meeting room located in the subbasement of the fraternity house. Later, he retrieved the recording device.

The recording consisted of a digital tape recording of an alleged hazing incident that occurred on August 11, 2001. The alleged hazing incident took place in the subbasement of the fraternity house. The alleged hazing consisted of a military-style lineup in which active members were addressed as "hell masters" and pledges were being trained. The associate dean of students, Thomas Baker, confirmed the communication was recorded at the fraternity house and members of the fraternity were doing the alleged hazing.

On November 19 Jones sent a letter to Steven Snyder, a fraternity chapter advisor, notifying him of the formal complaint against the fraternity, the impending investigation of the complaint, and requesting a meeting between the two of them. The letter alleged the fraternity violated the university's hazing and alcohol policies. On December 4

Mark Dagitz, the local fraternity province president and representative of the national fraternity organization of Phi Delta Theta, sent a letter to the current chapter president, placing the fraternity on "province probation" because it had violated the national fraternity's "risk management and alcohol-free housing policies." On December 12 Jones sent a letter to Dagitz explaining he reviewed a copy of the letter Dagitz sent to the chapter president and believed it to be an acknowledgement that a hazing and alcohol violation took place in the fraternity. Jones recommended settling the matter by the university giving Phi Delta Theta a one-year suspension of university recognition with the possibility of reinstatement after the year if the fraternity met several conditions as set forth by the university. The vice president also informed Dagitz that the fraternity could appeal his decision to the president of the university. After correspondence between Dagitz and Jones, on January 11, 2002, Jones sent a letter to Dagitz revoking the fraternity's recognition by the university for a period of at least one year, effective immediately. Jones cited the tape recording as evidence of the hazing.

The fraternity acknowledged the alcohol violations, but contested the hazing violation. In February counsel for the fraternity sent a letter to Jones informing him of the fraternity's intent to appeal his decision and request an evidentiary hearing. By August no hearing had been set. Negotiations between the fraternity and the university commenced, but ended when the fraternity refused to admit it engaged in hazing. A formal hearing was then scheduled.

An administrative hearing officer presided over a hearing on August 27, 2003. At the hearing, the president of the fraternity entered a plea of guilty to the charge that the fraternity served alcoholic beverages to the pledges at the chapter house in September of 2001, but

a plea of not guilty to the hazing charge. The tape recording was submitted as evidence by the university. Baker testified to the contents of the tape recording and stated that he believed the contents of the tape recording were authentic. Baker also testified he thought the activities heard in the recording were within the definition of hazing set forth in both the internal policies of the fraternity and the Interfraternity Council of the University of Iowa Constitution. Baker further testified he found the contents of the tape recording to be compelling evidence that hazing occurred, and that he initiated an investigation as a result of the tape's contents. When asked on cross-examination what he thought about Vejar's credibility, Baker testified it was irrelevant because he relied on the contents of the tape recording and not the statements of Vejar. Jones also testified Vejar's credibility was irrelevant because he believed the tape recording was authentic and stood on its own.

The hearing officer issued his decision on September 11. He found the tape recording to be authentic, and found Vejar's credibility irrelevant. The officer noted he based his decision on the evidence presented, and not on the allegations of Vejar. The officer continued the university's de-recognition of the fraternity.

On September 12, an attorney for the fraternity sent a fax to the hearing officer containing a copy of Iowa Code section 808B.7 regarding the interception and use of a recorded communication as evidence. He also sent a copy to an attorney for the university.

On November 21, Jones sent a letter to the fraternity informing them the university was dropping the hazing charges and imposing sanctions only for the alcohol violation admitted by the fraternity. The sanction imposed for the alcohol violation was a continued revocation of the fraternity's university recognition of its charter for an indefinite

period to be reinstated at the university's discretion. This revocation continued the temporary revocation that had been imposed pending the outcome of the administrative proceedings.

The fraternity appealed the sanction for the alcohol violation, and David Skorton, the president of the university, heard the appeal. The president issued an opinion on June 29, 2004, finding the passage of time during which the case was pending in the appeal process had been of sufficient duration for an appropriate sanction. The president reiterated and explained the conditions originally set by the vice president that the fraternity needed to meet before it would be re-recognized by the university.

On February 4, 2005, the Phi Delta Theta House Association and the fraternity filed suit against the State, the university, Jones, Baker, Maria Lukas, and David Bergeon. The fraternity alleged the defendants used the audiotape provided by Vejar in violation of Iowa Code section 808B. Baker, Lukas, and Bergeon were later dismissed as defendants on a motion for summary judgment.

After a bench trial, the district court dismissed the house association's claims. It found in favor of the fraternity and against the State, the university, and Jones. The court held the State, the university, and Jones violated chapter 808B. It further held that they used the unauthorized tape within the meaning of the statute continuously from November 19, 2001, until July 29, 2004, when Skorton issued his decision. The court utilized the liquidated damages provision of Iowa Code section 808B.8(2) and awarded the fraternity $100 per day from November 19, 2001, to July 29, 2004, (983 days) for a total of $98,300 against the defendants jointly and severally. The court also awarded punitive damages against Jones individually in the

amount of $5000. The court granted attorney fees to the fraternity against the defendants, jointly and severally, for $24,444.18. These fees represented the fees the fraternity incurred during the administrative hearing proceeding. The court granted the fraternity an additional amount for attorney fees of $37,216.25 against the defendants jointly and severally. These fees were for the fraternity's prosecution of the case in the district court. The State, the university, and Jones appeal. We will set out additional facts as they relate to the issues raised in this appeal.

## II. Issues.

All three of the defendants raise the following issues on appeal: (1) whether the fraternity had standing to bring the action; (2) whether the fraternity was a protected party under section 808B.8; (3) whether substantial evidence supported the finding that the intercepted communication was an "oral communication" protected by the statute; (4) whether substantial evidence supported a finding that defendants' conduct was willful as that term is used in the statute; (5) whether the defendants used the intercepted communication in violation of the statute; and (6) whether the district court properly calculated the compensatory damages and attorney fees.

In addition, Jones raises the following two issues on appeal: (1) whether he can be held personally liable for his actions; and (2) whether the fraternity is entitled to punitive damages for his actions.

## III. Scope of Review.

Because the case was tried at law, our review is for correction of errors at law. Iowa R. App. P. 6.4. We review the district court's decision to dismiss a case based on lack of standing for errors at law. *Godfrey v. State*, 752 N.W.2d 413, 417 (Iowa 2008). The district court findings have

the effect of a special verdict. Iowa R. App. P. 6.4. The district court's findings of fact are binding on us if supported by substantial evidence. Iowa R. App. P. 6.14(6)(*a*).

When a party challenges a district court's ruling claiming substantial evidence does not support the decision, we must view the evidence in the light most favorable to support the judgment and liberally construe the court's findings to uphold, rather than defeat, the result reached. *State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006). We will not find the evidence insubstantial merely because we may draw a different conclusion from it. *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004). The ultimate question is whether the evidence supports the court's finding, not whether the evidence would support a different finding. *Id.* On the other hand, the district court's conclusions of law and its application of its legal conclusions are not binding on appeal. *Id.*

**IV. Applicable Statutes.**

Our resolution of the issues is controlled by the following statutes. Section 808B.8 of the Iowa Code provides in relevant part:

1. A person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this chapter shall:

*a.* Have a civil cause of action against any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use such communications.

*b.* Be entitled to recover from any such person all of the following:

(1) Actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, or one thousand dollars, whichever is higher.

(2) Punitive damages upon a finding of a willful, malicious, or reckless violation of this chapter.

      (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Iowa Code § 808B.8(1).

An " '[o]*ral communication*' means an oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception, under circumstances justifying that expectation." *Id.* § 808B.1(8).

The legislature put the unlawful acts of chapter 808B in section 808B.2. The legislature made these acts class "D" felonies. *Id.* § 808B.2(1). A person violates chapter 808B when that person

> [w]illfully uses, or endeavors to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

*Id.* § 808B.2(1)(*d*).

**V. Analysis.**

**A. Whether the Fraternity Had Standing to Bring This Action**.
In order to have standing, the plaintiff must have a specific personal or legal interest and must be injured in fact. *Godfrey*, 752 N.W.2d at 418–19. The defendants claim the fraternity did not have standing to bring this action because the Iowa Beta Chapter of the fraternity was not in existence at the time of trial.

The defendants are not making a standing argument, but rather a real-party-in-interest argument. We recently explained the difference between standing and the real party in interest. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 434–35 (Iowa 2008). Standing requires that a party have a legal interest in the litigation and be injuriously affected. *Id.*

The real party in interest is the true owner of the right sought to be enforced. *Id.* at 435. The defendants' claim that the fraternity was not in existence at the time of litigation is analogous to a natural person dying before the conclusion of the lawsuit. When a person dies before the conclusion of the litigation, the person's estate is the real party in interest. *In re Estate of Voss*, 553 N.W.2d 878, 881–82 (Iowa 1996).

The district court found, and we agree, the fraternity was still in existence at the time of the litigation. Iowa Code section 4.1(20) defines "person" as an "association." Unincorporated associations can maintain an action in the name of the association. *Keller & Bennett v. Tracy*, 11 Iowa 530, 531 (1861). An association is "a collection of persons who have united or joined together for some special purpose or business, and who are called, for convenience, by a common name." 7 C.J.S. *Associations* § 1, at 25 (2004). Courts can consider a fraternity as an association for purposes of litigation. *See, e.g.*, *Garofalo v. Lamda Chi Alpha Fraternity*, 616 N.W.2d 647, 657–58 (Iowa 2000) (Lavorato, J., concurring in part) (stating a fraternity is an association for purposes of the action). An association can sue in its own name, or on behalf of its members. *Carson v. Pierce*, 719 F.2d 931, 933 (8th Cir. 1983). The question raised by the defendants is whether the fraternity was an active association during the litigation.

On February 4, 2005, the fraternity brought this suit in the name of the association, not in the name of any of its members. On February 2, 2006, the national headquarters informed the fraternity that its charter was suspended. The national organization expressed its regrets for taking such a serious action, but explained that it "felt the best way to ensure a bright *future* on the University of Iowa campus is to suspend operations *until* a time can be determined to return."

(Emphasis added.) Immediately prior to losing its charter the fraternity still had between thirteen and seventeen members living in the house, and approximately ten to fifteen members who did not live in the house. As of September 6, 2006, the date of the trial, the Iowa Beta Chapter did not have any student members. The fraternity continues to maintain a checking account, however, and files its tax returns every year.

Even though the national headquarters suspended the Iowa Beta Chapter's charter during the pendency of the litigation, there were still members of the association at the time the suit was concluded. Once a member graduates from the university, that person is an alumni member. Thus, that person's membership extends beyond the years of undergraduate education and that person remains part of the association known as the Iowa Beta Chapter of Phi Delta Theta. Moreover, both the national headquarters in its letter to the chapter, and the housing association representative, Steve Snyder, indicate an effort on behalf of the fraternity to regain its charter at the University of Iowa, creating the potential for the association to return to active status. While there were no student members at the time, there were certainly alumni members of the fraternity, including students who were members when the chapter lost its charter in the middle of their active membership. Thus, the fraternity is the real party in interest to bring this action.

**B. Whether the Fraternity Is a Protected Party Under Section 808B.8.** The defendants argue the fraternity is not a protected party under section 808B.8; therefore, it did not have standing under chapter 808B to maintain this action. The defendants rely on *Smoot v. United Transportation Union*, 246 F.3d 633 (6th Cir. 2001), claiming the fraternity did not have standing because the intercepted communications belonged to unidentifiable individuals, not to the fraternity.

To find standing under the federal act, the *Smoot* court looked for evidence in the record that the intercepted communication related to the organization's business. *Smoot*, 246 F.3d at 640. If the intercepted communication related to the organization's business, the organization had an identifiable injury giving it standing to maintain the action. *Id.* The gist of the defendants' argument is that there was no evidence the intercepted conversation related to fraternity business.

The University of Iowa Policies & Regulations affecting Students 2001–2002 states in section III, paragraph 8 that

> the vice president . . . may revoke a student organization's recognition . . . if . . . (b) a member of the organization violates University regulations at an event sponsored by the organization or in the course of the organization's affairs and the organization failed to exercise reasonable preventive measures.

The defendants relied on this provision to discipline the fraternity for hazing by indefinitely revoking the university's recognition of the fraternity.

The defendants used the intercepted communication as though it belonged to the fraternity. The associate dean identified the speakers as members of the fraternity and the defendants disciplined the entire fraternity because of the communication. Because the defendants held the entire fraternity responsible for the actions of the individuals whose communications they heard on the tape, it is clear the defendants treated the entire fraternity as though it had an ownership interest in the intercepted communication and was responsible for the events recorded on the tape. Therefore, under the test in *Smoot*, the intercepted conversation related to fraternity business, and the fraternity did have an identifiable injury under the statute.

**C. Whether Substantial Evidence Supports the Finding That the Intercepted Communication Was an "Oral Communication" Protected by the Statute.** The Iowa statute defines an oral communication as "an oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception, under circumstances justifying that expectation." Iowa Code § 808B.1(8). To decide whether the recording was an oral communication under chapter 808B, we must construe section 808B.1(8).

The purpose of statutory construction is to determine legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). Legislative intent is determined from the words chosen by the legislature, not by what it should or might have said. *State v. Wiederien*, 709 N.W.2d 538, 541 (Iowa 2006). Absent a statutory definition or an established meaning in the law, we give words their ordinary and common meaning by considering the context within which they are used. *City of Des Moines v. Employment Appeal Bd.*, 722 N.W.2d 183, 196 (Iowa 2006). When construing a statute, we are required to assess a statute in its entirety, not just isolated words or phrases. *Schadendorf v. Snap-On Tools Corp.*, 757 N.W.2d 330, 337 (Iowa 2008). When construing a statute, we avoid a construction that makes part of a statute redundant or irrelevant. *Id.* We try to give a statute a reasonable construction that best achieves the statute's purpose and avoids absurd results. *Id.*

Chapter 808B contains language similar to the language used by Congress to create a claim for civil damages for an intercepted oral communication in the Omnibus Crime Control and Safe Streets Act of 1968. Omnibus Crime Control and Safe Streets Act of 1968 § 801, 82 Stat. 211, 211–225 (1968) (current version at 18 U.S.C. §§ 2510–2522).

In 1986, Congress amended the Omnibus Crime Control and Safe Streets Act of 1968 by enacting the Electronic Communications Privacy Act. Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522. The Electronic Communications Privacy Act changed the elements required to be proven by a person seeking civil damages. *See Romano v. Terdik*, 939 F. Supp. 144, 145–46 (D. Conn. 1996) (explaining the difference between the elements to be proven in a civil action under the Omnibus Crime Control and Safe Streets Act of 1968 and the Electronic Communications Privacy Act). Because Iowa's act for civil damages is similar to the Omnibus Crime Control and Safe Streets Act of 1968, we are allowed to look to the federal law interpreting the 1968 Act before Congress amended it for guidance in interpreting chapter 808B. *See Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003) (stating when a state law is modeled after a federal law, we can look to the federal law for guidance in interpreting the state law). We are not bound, however, by the federal law interpretation. *Id.*

Congress used the same language in defining an "oral communication" in the Omnibus Crime Control and Safe Streets Act of 1968 as the Iowa legislature used in section 808B.1(8). *Compare* Omnibus Crime Control and Safe Streets Act of 1968 § 802, 82 Stat. at 212 (current version at 18 U.S.C. § 2510(2)), *with* Iowa Code § 808B.1(8). The legislative history concerning section 2510 and the language defining an "oral communication" indicate the definition is intended to reflect existing law on a person's expectation of privacy as discussed in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). S. Comm. on Judiciary, Omnibus Crime Control and Safe Streets Act of 1968, S. Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2178 (1968). The expectation of privacy test set forth in *Katz* normally

consists of two questions: "first . . . whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy' ' "; and second, "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable." ' ' " *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220, 227 (1979) (quoting *Katz*, 389 U.S. at 361, 88 S. Ct. at 516, 19 L. Ed. 2d at 588 (Harlan, J., concurring)). We believe this expectation of privacy test is applicable to section 808B.1(8).

Therefore, to determine whether a communication meets this definition, the fraternity, through the individuals uttering the communication, must have exhibited a subjective expectation of privacy and that expectation must be one that society is prepared to recognize as reasonable. The district court made the factual finding that the intercepted communication met the statute's definition of an oral communication. If substantial evidence supports this finding, we must affirm the district court's finding.

Substantial evidence supports the fraternity exhibited a subjective expectation of privacy in the conversations that Vejar intercepted. First, the fraternity's meetings were confidential and held in a subbasement meeting room of the fraternity house. Second, the fraternity rented rooms in the fraternity house during the summer for income but the renters did not have access to the chapter meeting rooms, while they did have access to other common areas of the house such as the kitchen, dining room, living room, and television room. Third, the fraternity stationed wardens at the meeting room door to exclude nonmembers from hearing what the members discussed in the room. Finally, the only way Vejar could hear a conversation held in the meeting room was for Vejar to record it clandestinely.

We also believe substantial evidence supports the fraternity's expectation of privacy is one that society is prepared to recognize as reasonable. This standard is an objective standard and not a subjective standard. *Id.* at 740–41, 99 S. Ct. at 2580, 61 L. Ed. 2d at 226–27. To determine whether society is prepared to recognize an expectation of privacy as reasonable, it is necessary to "reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S. Ct. 421, 430–31 n.12, 58 L. Ed. 2d 387, 401–02 n.12 (1978).

The fraternity is a private, for-members-only association. The fraternity house is the place where the members live. The room in the fraternity where Vejar intercepted the oral statements is the place where the fraternity conducted its private business. Society respects the right of a private organization to conduct its business in private. *See United States v. Bunkers*, 521 F.2d 1217, 1219 (9th Cir. 1975), *cert. denied*, 423 U.S. 989, 96 S. Ct. 400, 46 L. Ed. 2d 307 (1975); *cf. Mancusi v. DeForte*, 392 U.S. 364, 368–69, 88 S. Ct. 2120, 2123–24, 20 L. Ed. 2d 1154, 1159–60 (1968) (union official, even though he shared office, was entitled to expect that records would not be taken from his office without his permission). Therefore, these facts provide substantial evidence that the fraternity had an objective expectation of privacy in the communication that society is prepared to recognize and protect as reasonable.

Accordingly, we affirm the district court finding that the intercepted communication was an "oral communication" as defined in section 808B.1(8).

**D. Whether Substantial Evidence Supports That the Defendants' Conduct Was Willful as Used in the Statute.** A civil action exists when a person uses an oral communication in violation of

chapter 808B. Iowa Code § 808B.8(1)(*a*). A violation of chapter 808B occurs when a person willfully uses or endeavors to use, the contents of the oral communication, and the defendant knew or had reason to know the information was obtained through the unlawful interception of the oral communication. *Id.* § 808B.2(1)(*d*). An unlawful interception of the communication occurs when a person willfully intercepts an oral communication. *Id.* § 808B.2(1)(*a*).

The defendants claim for an act to be done willfully, as used in section 808B.2, the defendants and Vejar must have intentionally violated or recklessly disregarded a known legal right of the fraternity. At trial, the district court rejected the defendants' claim that a willfully done act means an act done by a person who intentionally violated or recklessly disregarded a known legal right. The court only required that the defendants and Vejar acted purposefully. We agree with the district court's conclusion that the word "willfully" as used in section 808B.2 means purposefully. We base our conclusion on our construction of sections 808B.2 and 808B.8.

Courts, including our court, have long struggled to come up with an all-encompassing definition for the word "willful" when the legislature uses it in a criminal statute. *State v. Azneer*, 526 N.W.2d 298, 299 (Iowa 1995). The explanation for this struggle is that no generic term can accommodate all the various crimes in which the legislature included the person's will as an element of the crime. *Id.*

When Congress adopted the willful standard in the Omnibus Crime Control and Safe Streets Act of 1968, the legislative history cited to the case of *United States v. Murdock*, 290 U.S 389, 54 S. Ct. 223, 78 L. Ed. 381 (1933) for the proposition a violation of the act must be willful to be criminal. S. Comm. on Judiciary, Omnibus Crime Control and Safe

Streets Act of 1968, S. Rep. No. 90–1097, *reprinted in* 1968 U.S.C.C.A.N. at 2181. *Murdock* is not very helpful to us in determining what the Iowa legislature meant by willfully in section 808B.2(1)(*d*). *Murdock* states one possible meaning for "willfully" is to denote "an act which is intentional, or knowing, or voluntary, as distinguished from accidental." 290 U.S. at 394, 54 S. Ct. at 225, 78 L. Ed. at 385. Another possible meaning of the term when used in a criminal statute is

> an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without ground for believing it is lawful, or conduct marked by careless disregard whether or not one has the right so to act.

*Id.* at 394–95, 54 S. Ct. at 225, 78 L. Ed. at 385 (citations omitted). The Supreme Court then stated, to determine the proper meaning the court must look to the context in which the word is used. *Id.* at 395, 54 S. Ct. at 226, 78 L. Ed. at 385.

In 1986, the Electronic Communications Privacy Act amended the Omnibus Crime Control and Safe Streets Act of 1968, deleting the word "willfully" from the statute, and requiring that a person had to *intentionally* use or endeavor to use the oral communication in order to violate the Act. 18 U.S.C. § 2511(1)(d). Before this change in the law became effective, two circuits of the United States Court of Appeals required the word "willfully" in a civil action under the Omnibus Crime Control and Safe Streets Act of 1968 "to denote at least a voluntary, intentional violation of, and perhaps also a reckless disregard of, a known legal duty," rather than an act which is intentional, or knowing, or voluntary, as distinguished from accidental. *Citron v. Citron*, 722 F.2d 14, 16 (2d Cir. 1983); *see Malouche v. JH Mgmt. Co.*, 839 F.2d 1024, 1026 (4th Cir. 1988).

On the other hand, state courts, using the willful standard in their interception-of-communications statutes, have reached the opposite conclusion. *Deibler v. State*, 776 A.2d 657, 665 (Md. 2001); *State v. O'Brien*, 774 A.2d 89, 104 (R.I. 2001). After reviewing the context in which the legislature used the word "willfully" in their statutes, both courts determined the proper definition of willfully was only to require purposeful conduct without a bad motive or a knowing unlawful component. *Deibler*, 776 A.2d at 665; *O'Brien*, 774 A.2d at 104.

In Iowa, our court has said our interpretation of the word "willfully" as used by the legislature is influenced by its statutory context. *State v. Osborn*, 368 N.W.2d 68, 70 (Iowa 1985). Upon our review of chapter 808B, we are convinced that the legislature meant for the word "willfully" in section 808B.2 to only require purposeful conduct without a bad motive or a knowing unlawful component. We base our conclusion on the legislature's use of the word "willful" in section 808B.8(1)(*b*)(2).

Before Congress amended the 1968 Act, a person violated the federal statute by willfully using, or endeavoring to use the contents of a wire, oral, or electronic communication. Omnibus Crime Control and Safe Streets Act of 1968 § 802, 82 Stat. at 213 (current version at 18 U.S.C. § 2511(d)); *see* Iowa Code § 808B.2. If a violation of the statute occurred, an aggrieved person was entitled to receive punitive damages without any further showing. Omnibus Crime Control and Safe Streets Act of 1968 § 802, 82 Stat. at 223 (current version at 18 U.S.C. § 2520(b)(2)). Thus, it made sense that the federal courts would interpret willfully to require the act to be done with a voluntary, intentional violation of a known legal duty, because punitive damages are not

normally awarded for a purposeful act done without a bad motive or knowing unlawful component.

Under the Iowa statute, a mere violation of the statute will not entitle an aggrieved person to receive punitive damages. In order for a person to receive punitive damages under the Iowa statute, the finder of fact must make "a finding of a willful, malicious, or reckless violation of this chapter." Iowa Code § 808B.8(1)(*b*)(2). If we define "willfully" in section 808B.2 as requiring a bad motive or knowing, unlawful component, every violation would entitle a person to punitive damages. Additionally, the "malicious," or "reckless" language in section 808B.8(1)(*b*)(2) would be surplus language, because all violations of section 808B.2 would give rise to punitive damages under the willful requirement of section 808B.8(1)(*b*)(2). Therefore, we conclude, in the context of the statute as passed by the legislature, the word "willfully" in section 808B.2 only requires purposeful conduct without a bad motive or knowing, unlawful component.

The requirement that the defendants knew or had reason to know the information was obtained through the unlawful interception of the oral communication is derived from section 808B.2(1)(*d*). The language of the federal statute before and after the amendment to the 1968 Act is the same. 18 U.S.C. § 2511(d). The federal courts have consistently construed this section to require the aggrieved person to prove that the user of the oral communication had " 'sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited [by the statute].' " *Williams v. Poulos*, 11 F.3d 271, 284 (1st Cir. 1993) (quoting *Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992)). We agree with the federal courts' construction because it is

consistent with our law that persons ordinarily should not escape the legal consequences of failing to observe statutory requirements by asserting ignorance of the law. *Diehl v. Diehl*, 421 N.W.2d 884, 888 (Iowa 1988).

Baker, the associate dean of students, testified the defendants knew Vejar placed the recording device clandestinely in order to obtain the recording. Baker also was aware of the fact that the taping of the oral communications was illegal. Baker and Jones both acknowledged that they did not care about the legal implications surrounding the use of the tape as evidence and purposefully used the tape to support the university's revocation of the fraternity's status.

Accordingly, substantial evidence supports that Vejar willfully intercepted the communication and that the defendants' conduct was willful.

**E. Whether the Defendants Used the Intercepted Communication in Violation of the Statute.** To be civilly liable under the Iowa statute a person must use the intercepted oral communication. *Id.* § 808B.8(1). The federal act has this same requirement. 18 U.S.C. § 2520(a). Neither the state statute nor the federal act defines the word "use." When a statute does not define a word and in the absence of an established meaning in law, courts generally presume the legislature used words contained in a statute in their ordinary and usual sense with the meaning commonly attributed to them. *Office of Consumer Advocate v. Iowa Utils. Bd.*, 744 N.W.2d 640, 643 (Iowa 2008). The dictionary defines "use" to mean, "to put into action." *Webster's Third New International Dictionary* 2523 (unabr. ed. 2002). Most federal courts have used this dictionary definition to require an active rather than a passive use of the intercepted communication for civil liability to attach under

the federal act. *See Peavy v. WFFA-TV, Inc.*, 221 F.3d 158, 174–75 (5th Cir. 2000) (finding the use of an intercepted communication as a basis for initiating an investigative report was a use within the act); *Dorris v. Absher*, 179 F.3d 420, 426 (6th Cir. 1999) (deciding that listening to the communications intercepted by her husband and typing out the termination notices dictated by him was not a use); *Reynolds v. Spears*, 93 F.3d 428, 432–33 (8th Cir. 1996) (overhearing a recording made by another is not a use); *Leach v. Bryam*, 68 F. Supp. 2d 1072, 1075 (D. Minn. 1999) (holding a letter from attorney sent to another attorney containing a veiled threat to use secretly taped phone conversations to effectuate a settlement of a dispute was a use); *Fields v. Atchison, Topeka, & Santa Fe Ry.*, 985 F. Supp. 1308, 1313–14 (D. Kan. 1997), *withdrawn in part by Fields v. Atchison, Topeka & Santa Fe Ry.*, 5 F. Supp. 2d 1160 (D. Kan. 1998) (concluding that the conduct of listening did not fall within the definition of use). *But see Thompson v. Dulaney*, 838 F. Supp. 1535, 1547–48 (D. Utah 1993) (holding mere listening to an intercepted communication was a use).

We believe mere listening to the intercepted communication is not a use under the Iowa statute. Rather, a person must actively use the intercepted communication for civil liability to attach. The district court required an active use of the tape for liability to attach under the Iowa statute. Therefore, if substantial evidence supports its finding, we must affirm on this issue.

The evidence shows the defendants actively used the intercepted communication to do their investigation, to notify the fraternity of the charges against them, to attempt to force the fraternity to settle the dispute by admitting to the charge of hazing, to file a formal complaint against the fraternity, and to prove the charge of hazing. *See Peavy*, 221

F.3d at 174–75 (using an intercepted communication as a basis for initiating an investigative report was a use within the act); *Leach*, 68 F. Supp. 2d at 1075 (holding a letter from attorney sent to another attorney containing a veiled threat to use secretly taped phone conversations to effectuate a settlement of a dispute was a use). It was only after the defendants became aware that using the tape in the manner in which they did violated section 808B.7 that the defendants withdrew the hazing charge. The finder of fact can infer the withdrawal to be an attempt by the defendants to discontinue their use under section 808B.7.

Accordingly, substantial evidence supports the district court's finding that the defendants used the tape in violation of section 808B.8.

**F. Whether Jones Can Be Held Personally Liable for His Actions.** The trial of this matter ended on September 7, 2006. At the conclusion of the trial, the parties decided not to orally argue the case to the court. Instead, the parties agreed they would submit written post-trial briefs and arguments. The court agreed and required the parties to simultaneously submit their briefs and arguments by the close of business on September 18. The court also held the record open for submission of the attorney fee issue.

For the first time in his post-trial brief and argument, Jones raised the issue that he had no personal liability under section 669.5. The relevant part of this statute provides:

> Upon certification by the attorney general that a defendant in a suit was an employee of the state acting within the scope of the employee's office or employment at the time of the incident upon which the claim is based, the suit commenced upon the claim shall be deemed to be an action against the state under the provisions of this chapter, and if the state is not already a defendant, the state shall be substituted as the defendant in place of the employee.

Iowa Code § 669.5(2)(*a*).[1]  The legislature added this section to the Code during the 2006 legislative session, effective July 1, 2006.  2006 Iowa Acts ch. 1185, § 107.  Phi Delta Theta filed its petition against Jones in February 2005, prior to the enactment of this section.  Prior to the amendment, the statute allowed an employee to be held personally liable.  Iowa Code § 669.21.  In the brief where Jones raised this issue, his counsel, an assistant attorney general, stated "[t]he Attorney General certifies Defendant Philip Jones was an employee of the state acting with the scope of his office and employment at the time of the incidents upon which the Plaintiffs' claims are based."

In its ruling on the merits of this matter the court noted defendants in their post-trial brief argued for the first time that an amendment to section 669.5 relieved Jones of personal liability and that he should be dismissed from the case.  There were no responsive pleadings filed by the fraternity regarding this claim.

The district court addressed this issue and found it could hold Jones personally liable because the amendment to section 669.5 operated only prospectively, and Jones acknowledged in a previous brief filed with the court in April of 2006 that the fraternity complied with all the procedures of chapter 669, the Iowa Tort Claims Act, in pursuing its claim against Jones.  We agree with the district court and find section 669.5, as amended, does not apply retrospectively to this case.[2]

---

[1]This new section was first codified in the 2007 Code of Iowa.

[2]Jones did not introduce the evidence of the attorney general certification during trial.  Instead he introduced the evidence in his final argument.  *See State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975) (holding counsel cannot introduce evidence in a final argument).  Phi Delta Theta did not challenge the manner in which the certification was submitted to the trial court, and therefore, we consider this evidence on appeal.

Legislative intent determines if a court will apply a statute retrospectively or prospectively. *Emmet County State Bank v. Reutter*, 439 N.W.2d 651, 653 (Iowa 1989). Generally, a newly enacted statute is presumed to apply prospectively, unless expressly made retrospective. *See City of Waterloo v. Bainbridge*, 749 N.W.2d 245, 249 (Iowa 2008); *see also* Iowa Code § 4.5. However, when the statute relates solely to remedy or procedure, a court can apply the statute both prospectively and retrospectively. *Bainbridge*, 749 N.W.2d at 249. A statute that relates to a substantive right is ordinarily applied prospectively only. *Baldwin v. City of Waterloo*, 372 N.W.2d 486, 491 (Iowa 1985).

The first step in determining if a statute applies retrospectively, prospectively, or both is to determine whether the legislature expressly stated its intention. The legislature did not expressly state that Iowa Code section 669.5 applies retrospectively.

In the absence of a legislative declaration that the statute applies retrospectively, the second step of the analysis is to determine whether the statute is procedural, remedial, or substantive. A substantive statute "creates, defines and regulates rights" whereas a procedural law " 'is the practice, method, procedure, or legal machinery by which the substantive law is enforced or made effective.' " *Id.* (citations omitted). A remedial statute intends to correct "existing law or redress an existing grievance." *Id.*

In *Moose v. Rich*, our court considered the retrospective application of a statute passed by the legislature immunizing co-employees from liability for their negligent acts. 253 N.W.2d 565, 571–72 (Iowa 1977). In *Moose*, the jury returned a verdict finding that a co-employee's negligence caused the plaintiff's injuries. *Id.* at 567–68. The negligent act of the co-employee occurred in 1971. *Id.* at 567. In 1974, the

legislature passed a new statute immunizing an employee from liability to co-employees for his or her negligent acts. 1974 Iowa Acts ch. 1111, § 1 (now codified at Iowa Code section 85.20). The new statute, section 85.20, only allowed co-employee liability upon a showing of gross negligence. Iowa Code § 85.20. The defendant contended the jury could not find him liable for the plaintiff's injuries because section 85.20 applied retrospectively. *Moose*, 253 N.W.2d at 571. We rejected the defendant's claim that the court should apply section 85.20 retrospectively. *Id.* at 572. In doing so, we determined the law was substantive because it involved the limitations on a right of an employee to receive compensation from a co-employee. *Id.* We also held the law was not remedial because the law did not redress a wrong, but made a policy decision to limit the redress available to the plaintiff. *Id.*

Although, we do allow a statute to apply retrospectively when the statute provides an additional remedy to an already existing remedy or provides a remedy for an already existing loss, we have refused to apply a statute retrospectively when the statute eliminates or limits a remedy. *Groesbeck v. Napier*, 275 N.W.2d 388, 390–91 (Iowa 1979) (citing *Moose*, 253 N.W.2d at 572). In the latter situation, we have found the statute to be substantive rather than procedural or remedial. *Id.* at 391.

Similarly, in this case, the amendment to section 669.5(2)(*a*) limited the right of a person to seek compensation from a state employee by relieving a state employee from personal liability when the employee is acting within the scope of his or her employment. At the time of the commission of the tort, Jones could be held personally liable for his acts. After the amendment, only the State could be held liable for Jones' acts. Thus, this law is a substantive law that "creates, defines and regulates rights" rather than merely being the practice or method of enforcing

rights or addressing an existing grievance. Therefore, the district court was correct in holding Jones personally liable for his actions.

**G. Whether the Fraternity is Entitled to an Award of Punitive Damages Against Jones.** The district court awarded the fraternity punitive damages against Jones in the sum of $5000. Jones claims his conduct does not entitle the fraternity to recover punitive damages against him.

Section 808B.8(1)(*b*)(2) allows a court to award "[p]unitive damages upon a finding of a willful, malicious, or reckless violation *of this chapter.*" (Emphasis added.) As previously stated in division V(D) of this opinion, for civil liability to attach, a person's conduct only needs to be purposeful conduct without a bad motive or knowingly unlawful component. It follows from our discussion in division V(D) that the legislature intended more than a purposeful violation of the statute before a court could award punitive damages. Accordingly, to recover punitive damages under section 808B.8(1)(*b*)(2), a person must prove "at least a voluntary, intentional violation of, and perhaps also a reckless disregard of, a known legal duty." *Citron*, 722 F.2d at 16; *see Malouche*, 839 F.2d at 1026.

The only testimony at the hearing from Jones regarding his conduct in using the tape is as follows:

> Q. Were you aware that the tape that he presented may have been made illegally? A. I don't know.
>
> Q. Were you concerned about that? A. No, I wasn't.
>
> Q. Why were you not? A. Because it was -- I did not have to consider it within the context of its legality, for admissible or inadmissible.
>
> Q. Why was that? A. Because I was not in a criminal court situation.

Although the testimony establishes he used the tape purposefully, nothing in this exchange establishes or infers that Jones voluntarily, intentionally, or recklessly violated a known legal duty. Under this standard, an award of punitive damages is only allowed if the person knew of the requirements of the act and acted willfully, maliciously, or reckless in violating the act. The evidence does not establish Jones knew his use of the tape violated the act.

Up until the time the fraternity made Jones aware of chapter 808B, the evidence only supports that Jones knew that a clandestinely taped conversation might not be admissible in a court of law. The fraternity never established that Jones knew using a clandestinely taped conversation violated chapter 808B. In fact, when the fraternity informed Jones that the mere use of the tape violated chapter 808B, the university dropped the hazing charges and abandoned the use of the tape.

Consequently as a matter of law, the evidence was insufficient to award punitive damages and the judgment for punitive damages against Jones is reversed.

**H. Whether the District Court Properly Calculated the Compensatory Damages and Attorney Fees.** Section 808B.8(1)(*b*)(1) allows for an award of "[a]ctual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, or one thousand dollars, whichever is higher." The district court did not award the fraternity actual damages. It did award the fraternity liquidated damages in the sum of $100 per day for 983 days for the period from November 19, 2001, to July 29, 2004. The total liquidated damage award amounted to $98,300. On appeal, the only claim the defendants make is that liquidated damages should have

stopped on November 21, 2003, the day the hazing charges were dismissed.[3] The defendants contend November 21 is the day they stopped using the intercepted communication. The fraternity does not respond to this argument in its brief.

The defendants dismissed the hazing charge on November 21. We agree with the defendants that when the hazing charges were dismissed, the defendants were no longer using the intercepted communication. Accordingly, the computation of liquidated damages should have stopped on November 21. Consequently, the district court should have only awarded liquidated damages for 732 days, for a total amount of $73,200.

The next issue the defendants raise concerns the attorney fees the court awarded the fraternity for the fees and costs the fraternity had to expend to fight the administrative action the university instituted to discipline it for the alleged hazing and alcohol violations. These fees amounted to $24,444.18.

We have repeatedly stated that, as a general rule in Iowa, the court cannot award attorney fees in the absence of a statute or contract authorizing an award of attorney fees. *Suss v. Schammel*, 375 N.W.2d 252, 256 (Iowa 1985); *Harris v. Short*, 253 Iowa 1206, 1208–10, 115 N.W.2d 865, 866–67 (1962). Section 808B.8(1)(*b*)(3) does allow for an award of a "reasonable attorney's fee and other litigation costs reasonably incurred." This section only allows the fraternity to be awarded its attorney fees and costs incurred in prosecuting its claim under section 808B.8 for the defendants' use of the intercepted communication. Section 808B.8(1)(*b*)(3) does not allow for the recovery of attorney fees incurred in an administrative process, where the issue is

---

[3]The defendants have not argued that section 808B.8(1)(*b*)(1) places a one-thousand-dollar cap on liquidated damages, so we do not address this issue.

whether the fraternity should be disciplined. At best, the attorney fees incurred in the administrative process may be recoverable as actual damages.

Although the fraternity argues these attorney fees are recoverable as actual damages, the fraternity cannot recover both actual and liquidated compensatory damages under section 808B.8(1)(*b*)(1). Section 808B.8(1)(*b*)(1) only allows for the recovery of the higher of the two damages. The district court awarded the fraternity liquidated damages in the sum of $98,300. We upheld the liquidated damage award, but reduced the award to $73,200. The liquidated damages awarded to the fraternity are greater than the attorney fees incurred by the fraternity in the administrative process. Thus, the district court should not have also awarded the fraternity its actual damages for the attorney fees incurred in the administrative process. Consequently, we reverse the judgment for attorney fees and costs for $24,444.18 entered against the defendants.

Finally, the defendants claim we should reverse the award of attorney fees and costs incurred by the fraternity in prosecution of this case in the district court because we should reverse the underlying judgment. We are only modifying, not reversing the underlying judgment; therefore, we affirm the award of attorney fees and costs incurred by the fraternity to prosecute the district court case in the sum of $37,216.25.

## VI. Disposition.

For the reasons stated in this opinion, we reverse the $5000 punitive damage award against Jones and the $24,444.18 award for attorney fees and costs against all the defendants. We also reduce the liquidated damage award to $73,200. We otherwise affirm the judgment

of the district court.  We remand the case to the district court to enter judgment in this matter consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

All justices concur except Baker, J., who takes no part.