# IN THE COURT OF APPEALS OF IOWA

No. 21-1913
Filed November 17, 2022

**K.C. on behalf of T.L.S.,**
    Petitioner-Appellee,

**vs.**

**T.D.L.,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Warren County, Brendan E. Greiner, District Associate Judge.

T.L. appeals the imposition of a protective order for relief from sexual abuse entered under Iowa Code chapter 236A (2021). **AFFIRMED.**

Amy K. Davis of Miller, Zimmerman & Evans, P.L.C., Des Moines, for appellant.

Jami J. Hagemeier of The Youth Law Center, Des Moines, attorney and guardian ad litem for minor child, appellee.

K.C., self-represented appellee.

Heard by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**CHICCHELLY, Judge.**

T.L. appeals the imposition of a protective order for relief from sexual abuse entered under Iowa Code chapter 236A (2021).  He challenges the sufficiency of the evidence supporting a finding of sexual abuse.  He also challenges the ruling quashing the subpoena of the child victim and allowing a videotaped forensic interview into evidence in its place.

Substantial evidence supports a finding that a preponderance of the evidence shows T.L. committed sexual abuse.  T.L. has not preserved error on his claim that the court erred by appointing the guardian ad litem who moved to quash the subpoena, and there is no showing that the court abused its discretion in granting quashal.  For these reasons, we affirm.

**I. Background Facts and Proceedings.**

K.C. petitioned for relief against sexual abuse, alleging that T.L. sexually assaulted her daughter, T.S.[1]  K.C. claims she learned of the assault after picking T.S. up from school in September 2021.  Because T.S. has an intellectual disability,[2] K.C. pieced this information together from fragments of statements T.S. made:

---

[1]  T.S. and T.L. are both preteens.  T.S. is in her father's physical custody, and T.L. is in his mother's physical custody.  Because T.S.'s father and T.L.'s mother married, T.S. and T.L. shared a residence.

[2] A psychological evaluation from September 2020 diagnosed T.S. with "Mild Intellectual Disability."  T.S. scored in the "very low to extremely low range" on a test of intellectual functioning.  The evaluator concluded that T.S.'s "verbal reasoning skills are in the extremely low range and indicate that [T.S.] will tend to have a poorly developed word knowledge and problems with verbal expression. These deficits are likely to be present in her efforts to communicate with others." Testing of T.S.'s adaptive skills functioning showed her ability to communicate was "significantly below other individuals her age and indicate[d] that she will have difficulty in all areas of communication."  The evaluator concluded that T.S. "is likely

[T.S.] said that [T.L.] would—first it started with a dream, that she kept having bad dreams at her father's house. And I asked what they were about. She stated that she was flying inside her father's house, and she was scared. And I asked what she was flying from. And she said a monster—or—and I asked what she was flying from.

I said, "Are you flying from a monster?"

And she then stated, . . . that [T.L.] would wake her up in the middle of the night, sometimes bringing in a stuffed animal, telling her to be quiet, threatening to break her leg if she made a sound.

K.C. went to the local police, who referred her to the STAR Center for a forensic interview.

The STAR Center interviewed T.S. about the abuse allegations one week later. During the videotaped interview, T.S. talks about T.L. doing "this" as she makes a gesture. The interviewer asked T.S. to explain what she meant:

Q. What do you mean when you say this? A. When he did (gestures).
Q. What does that mean? A. It's probably touching your private parts, and it's really disgusting.
Q. Did that happen? A. Yeah.
Q. What did he touch your private part with? A. His hand. And it was really gross and I felt it.
Q. Did it touch the clothes or the skin of your private part? A. The skin of my private part.

K.C. represented herself in the proceedings under chapter 236A, and T.L. was represented by counsel. The district court appointed a guardian ad litem to represent T.S. When T.L. subpoenaed T.S. to testify, the guardian ad litem moved to quash the subpoena and admit the videotape of the forensic interview in place of live testimony. The district court granted the motion and allowed K.C. to introduce the videotaped interview of T.S. as evidence. K.C. also testified in

---

to lack understanding of information received from others and to have equal difficulty using words and sentences to express her own thoughts and ideas."

support of her petition. T.L. offered testimony by both T.S.'s father and his father, as well as a police detective who investigated T.S.'s allegations.

At the close of the hearing, the guardian ad litem argued a preponderance of the evidence showed a sex act and sex abuse occurred:

> From the STAR Center interview, Your Honor, and from my client's words, I would support that the evidence has been shown that a sex act has occurred. Pursuant to that video, [T.S.] was able to say that [T.L.] had come into her room, that he had brought a toy with him, she was able to act out what occurred, and was able to then talk about what she did in order to have him stop and then what she needed to do once the act was concluded. So I think in that interview, I think she was very clear with her words, and I believe in your order as stated she was interviewed by a forensic interviewer, non-leading questions.

The district court agreed that the interview "is compelling and is more than sufficient to sustain the petition." It entered an order prohibiting T.L. from having contact with T.S., and T.L appealed.

**II. Scope of Review.**

Proceedings under chapter 236A "shall be held in accordance with the rules of civil procedure." The parties agree the action was tried at law, and our review is for correction of errors at law. *See* Iowa R. App. P. 6.907.

**III. Sufficiency of the Evidence.**

T.L. first challenges to the sufficiency of the evidence supporting the allegations in the petition. He argues K.C. failed to show by a preponderance of the evidence that he sexually abused T.S.

We begin with our standard of review. "[W]e must view the evidence in the light most favorable to support the judgment and liberally construe the court's finding to uphold, rather than defeat, the result reached." *Papillon v. Jones*, 892

N.W.2d 763, 770 (Iowa 2017) (citation omitted). We are bound by the district court's fact findings if supported by substantial evidence. *See Iowa Beta Chapter of Phi Delta Theta Fraternity v. State*, 763 N.W.2d 250, 257 (Iowa 2009). Evidence is substantial if reasonable minds would find it adequate to reach the same finding. *See Zaw v. Birusingh*, 974 N.W.2d 140, 160 (Iowa Ct. App. 2021). We cannot substitute our own findings for those of the district court simply because the evidence supports different inferences. *See Iowa Beta Chapter of Phi Delta Theta Fraternity*, 763 N.W.2d at 257. The question is not whether the evidence would support a different finding but whether it supports the finding made by the court. *See id.*

We then turn to the requirements of chapter 236A. The court can issue a protective order under that chapter only after finding sexual abuse has occurred. *See* Iowa Code § 236A.3(2) ("If the factual basis for the alleged sexual abuse is contested, the court shall issue a protective order based upon a finding of sexual abuse . . . ."). Sexual abuse occurs when a person commits a sex act "by force or against the will of the other" or when "[s]uch other person is a child." *Id.* § 709.1(1), (3) (defining sexual abuse); *see also id.* § 236A.2(5) (stating, in part, that the commission of any crime defined in chapter 709 is sexual abuse under chapter 236A). The petitioner bears the burden of showing by a preponderance of the evidence that sexual abuse occurred. *Id.* § 236A.3(2). "A preponderance of the evidence is the evidence 'that is more convincing than opposing evidence' or 'more likely true than not true.'" *In re K.D.*, 975 N.W.2d 310, 320 (Iowa 2022) (citation omitted). "The evidence may preponderate, and yet leave the mind in doubt as to the very truth. In such cases the evidence does not fairly set the

question at rest, but merely preponderates in favor of that side whereon the doubts have less weight." *Walthart v. Bd. of Directors of Edgewood-Colesburg Cmty. Sch. Dist.*, 694 N.W.2d 740, 744 (Iowa 2005) (citation omitted).

With these precepts in mind, we turn to the evidence. Because the sexual abuse allegedly happened at night in T.S.'s bedroom without witnesses, most of the relevant evidence comes from the STAR Center forensic interview of T.S. The limits of T.S.'s ability to communicate are apparent during the interview. T.S. often meanders from a question mid-answer, interjecting non sequiturs to share her stepmother's age or show her painted fingernails. Her demeanor is casual throughout the interview, but she uses animated facial expressions and gestures when recalling events as though acting them out.[3]

During the interview, T.S.'s most incoherent answer stems from a question she does not understand. The interviewer asks T.S., "What is your ocular hue?" Although the interviewer had just explained that T.S. should say if she does not understand a question, T.S. tries to answer anyway:

---

[3] As an example, the interviewer asks T.S. what she did from the time she woke up that morning up to the time she arrived at the interview. The timestamp on the video shows that the interview begins at 9:30 a.m. T.S. begins by looking around for a clock before venturing a guess that she woke up at 5:30. T.S. says, "I was like, 'Mom, I need to'" and gestures opening her eye with one hand. She then continues: "So, I took a shower in the morning. And I brushed my hair. Well, [L.] did but, um." The next thing T.S. mentions is her arrival at the interview: "We were a few minutes away from here and then—" T.S. again stops speaking as she gestures expansively with her arms before continuing: "Here we go, right? And like, 'Is that my dad? I can't believe my dad is already here.'" Her tone of voice and expression then changes as though to suggest she is repeating another person's words when she continues: "Okay, it's okay. I got this." T.S. then concludes her answer by resuming her former demeanor and saying, "So, that's the truth."

> T.S.: Okay, my ocular hue is if I asked mom if she can take me back tomorrow to school and say, "It's okay if you go back to school for a little bit."
> Interviewer: Do you know what 'ocular hue' means?
> T.S.: Yeah, but my mom said, "I'm going to take you to school. I can't believe your mom—your dad—I don't know. But they'll like, dramatically arguing a little bit, but not just every time. But sometimes I just really feel like my dad wants me to go to his house for a little bit and go to my mom's for a little bit. But I wish my mom would say, "Hey, I need you to go away from your dad. I don't want him stealing your money." Well, actually he doesn't have my money but—I do.

The interviewer then reiterates that T.S. can say, "I don't know" if she does not know the answer to a question, adding, "You don't have to do any guessing." She illustrates this by following up with a simpler question, asking, "Do I have a dog at my house?" This time, rather than guessing at an answer, T.S. shakes her head to reflect she does not know.

Unlike in her answer about ocular hue, T.S. is clear in articulating what happened to her. When asked to explain the gesture she makes when explaining what T.L. did to her, T.S. answers that T.L. placed his bare hand on her bare genitals. The district court found the interview "is not only compelling and reliable, it is believable that an assault with intent to commit sex abuse occurred." Because the district court "has the prerogative to determine which evidence is entitled to belief" and "a better opportunity than we do to evaluate the credibility of witnesses," we defer to its determination about T.S.'s interview. *See Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) (stating "factual disputes depending heavily on . . . credibility are best resolved by the district court").

The question is whether a reasonable mind would find there is adequate evidence to support the finding that it is more likely that sexual abuse occurred

than did not. Viewing the evidence in the light most favorable to the district court's ruling, deferring to its credibility findings, and giving the interview the same weight, we find that it would. Although a reasonable person could reach a different finding on the same evidence, that is not relevant to the question before us. Because sufficient evidence supports the finding that T.L. committed sexual abuse, we affirm.

### IV. Evidentiary Rulings.

T.L. also challenges the ruling granting the motion to quash the subpoena of T.S. and allowing the STAR Center interview in place of live testimony.[4] Because only the guardian ad litem moved to quash the subpoena, most of T.L.'s argument focuses on whether the court could appoint the guardian ad litem. T.L. admits he lodged no objection to the guardian ad litem's appointment below and thus concedes that "error is not necessarily preserved." "Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court." *Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 539 (Iowa 2022) (citation omitted). Because T.L. failed to preserve error by objecting to the appointment of the guardian ad litem in the district court, we will not consider the propriety of the appointment for the first time on appeal.

---

[4] In a footnote, T.L. questions "whether the district court had authority to appoint a guardian ad litem" under Iowa Code section 915.37. But he concedes that "error is not necessarily preserved" because he never objected to the appointment. Because T.L. failed to preserve error by raising an objection below, we do not consider the issue on appeal.

We turn to the question of quashal and the substitution of the STAR Center interview for live testimony, which are preserved for our review. Iowa Rule of Civil Procedure 1.1701(4)(d)(1)(4) requires the court to quash a subpoena if it "[s]ubjects a person to undue burden." *See, e.g.*, Iowa R. Civ. P. 1.504(1)(a) (allowing the court to grant an order protecting any person from whom discovery is sought "from annoyance, embarrassment, oppression, or undue burden or expense"). An undue burden is "[a] substantial and unjust obstacle to the performance of a duty." *Burden*, *Black's Law Dictionary* (11th ed. 2019).

The guardian ad litem argued that requiring T.S. to testify live and in person would subject T.S. to an undue burden because of her disability. In support of her motion to quash, she filed as an exhibit the September 2020 psychological evaluation of T.S. that details the extent of T.S.'s mental disability. In resisting the motion to quash,[5] T.L. argued that there was no showing of undue burden and live testimony was necessary for the court to determine T.S.'s credibility, which was central to K.C.'s petition.

The district court has "wide discretion" in ruling on a motion to quash. *See Morris v. Morris*, 383 N.W.2d 527, 529 (Iowa 1986). We also afford the lower court discretion in deciding whether to allow a child's in-person testimony when it goes against the child's best interests. *See Mauk v. State Dep't of Hum. Servs.*, 617 N.W.2d 909, 913 (Iowa 2000) (citing *In re E.H. III*, 578 N.W.2d 243, 246 (Iowa 1998), in which the court found "no abuse of discretion in the juvenile court's conclusion that the best interests of the children militated against their testimony

---

[5] T.L. did not object to the court considering the videotaped interview as evidence; he objected only to use of the interview instead of live testimony.

in court" based on the beliefs of their mother, guardian ad litem, and therapists that testifying would traumatize the children); *see also In re E.H.*, No. 02-0453, 2002 WL 31538128, at *1 (Iowa Ct. App. Nov. 15, 2002) ("The trial court is given discretion in determining whether child witnesses must testify."). In granting the guardian ad litem's motion, the district court noted the limitations in T.S.'s ability to communicate, with the psychological evaluation assessing "socialization skills similar to children age two to three."[6] The court also shared the guardian ad litem's concern that K.C. conducting direct examination of T.S. would cause inherent bias, while the forensic interview—"[a] neutral examination in a controlled environment, from an unbiased interviewer"—lead to more reliable answers. Finally, although K.C. and T.S.'s father disagreed on the pivotal issue of whether sexual abuse occurred, they both suggested that requiring in-person testimony would unduly

---

[6] T.S. was ten years old at the time of the hearing. In other circumstances, a child of that age may be competent to testify at trial. *See St. Peter v. Iowa Tel. Co.*, 131 N.W. 2, 4 (Iowa 1911) (observing "the trial judge has better opportunity to judge of these than an appellate court" in affirming a district court's conclusion that a ten-year-old witness was competent to testify). But as our supreme court has noted, the competency of a child has less to do with age and more to do with a child's maturity and intelligence:

> There is no particular age at which a child becomes competent as a witness. The statute fixes no age, and requires only that the witness have sufficient capacity to understand the obligation of an oath. A child of sufficient maturity and intelligence to receive correct impressions from its surroundings, and to remember and correctly narrate transactions, is a competent witness, if he also comprehend the meaning and obligation of an oath. If a child has the necessary intelligence and appreciates the moral duty to tell the truth, he need not fully understand the nature of an oath, or have any particular religious belief or training to qualify him as a witness.

*Clark v. Finnegan*, 103 N.W. 970, 970 (Iowa 1905) (internal citations omitted). That distinction is important here, where T.S.'s intellectual functioning is significantly lower than her biological age would suggest.

burden T.S.[7]  Because the record supports the court's reasoning, we find no abuse of discretion in granting the motion to quash.

T.L. cites to *State v. Skahill*, 966 N.W.2d 1 (Iowa 2021), to argue that the court misplaced its reliance on the STAR Center interview.  The court in *Skahill* considered the admissibility of a forensic interview of a child victim in a criminal prosecution for sexual abuse *in addition to* the child's live testimony.  966 N.W.2d at 4.  The court found the interviews "were not *more* probative than the otherwise available live testimony under which [the child] could be (and was) cross-examined."  *Id.* at 15.  As a result, the court held the residual hearsay exception did not apply.  *Id.*

T.L. never challenged the admissibility of the STAR Center interview below.  Nor does he challenge it on appeal.  He instead cites to *Skahill* for observations about the difference between taped forensic interviews and live testimony, which the supreme court made during its harmless-error analysis:

> Forensic interviews can be different from and, sometimes, more powerful than trial testimony.  The questioner can be—indeed, often should be—openly sympathetic to the child.  The interviewer and the child may be able to develop a rapport.  There is no requirement in a forensic interview to ask only legally relevant questions or to avoid repetition.  The narrative may flow more naturally than in the bumpy give-and-take of a trial—the setting in which witnesses normally must provide their testimony.

---

[7] At the hearing on the motion to quash, T.S.'s father asked the court to examine T.S. in camera instead of T.S. giving live testimony because he believed testifying in person would go against T.S.'s best interests.  K.C. agreed that giving live testimony would not be in T.S.'s best interests because "it would be more traumatic for her to have to go and be interrogated even further, whether it be by me or by a stranger.  Just to have more questions regarding the matter is already hard enough on her to talk about."

*Id.* at 16. T.L. argues that for the same reasons, the court gave the STAR Center interview more weight than it deserved even though T.S. "was incoherent in her interview, and unable to provide any specific dates or specific instances of alleged sexual abuse."[8] But this complaint goes to the weight of the evidence rather than its admissibility. The district court noted the limitations in T.S.'s ability to communicate during the interview and still found her statements about the sexual abuse to be credible and persuasive. As stated above, we defer to the district court on the question of what weight to give the evidence.

**AFFIRMED.**

---

[8] T.L. argues the interview is like the one described in *M.W. on behalf of B.W. v. J.W.*, No. 19-0574, 2020 WL 4200856, at *3 (Iowa Ct. App. July 22, 2020), in which this court affirmed the denial of a petition for relief from sexual abuse filed against the father of a two-year-old child. As in this case, a videotaped interview of the child was admitted into evidence and provided "our only opportunity to directly observe the child." *M.W.*, 2020 WL 4200856, at *3. But the child's interview in *M.W.* "largely refute[d] the allegations the father inappropriately touched the child." *Id.*